UNITED STATES, Appellee,

v.

**Davy MAK, a/k/a Wai Hung Mak, Defendant, Appellant.**

No. 90–1685.

United States Court of Appeals, First Circuit.

Submitted Jan. 8, 1991.

Decided Feb. 28, 1991.

* Of the District of Massachusetts, sitting by desig-

Stanley E. Greenidge, Federal Defender Office, on brief, Boston, Mass., for defendant, appellant.

Stephen P. Heymann, Asst. U.S. Atty., and Wayne A. Budd, U.S. Atty., on brief, Boston, Mass., for appellee.

Before BREYER, Chief Judge, CAMPBELL, Circuit Judge, and CAFFREY,* Senior District Judge.

BREYER, Chief Judge.

The United States, in a five count indictment, charged the appellant, Davy Mak, with conspiring to import, and importing, heroin into the United States. *See* 21 U.S.C. §§ 952 (importation), 963 (conspiracy). Mak pleaded guilty to four of the

nation.

five counts; the Government dropped the remaining fifth count. The district court then calculated a sentence based on the total amount of drugs involved in the conduct underlying *all* five counts, including the dropped fifth count. Mak appeals, arguing that the court should have limited the drugs it considered to those involved in the first four counts, not the fifth.

## I

The parties and the district court all recognize that the Sentencing Guidelines, in a case like this one, base the sentence primarily upon the amount of drugs involved in the conduct that, in fact, underlies the offenses of conviction. In determining the bounds of the conduct considered, the Guidelines include all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(2); *id.* comment. (backg'd) ("in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan"); *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990); *United States v. Blanco*, 888 F.2d 907, 909 (1st Cir.1989); *United States v. Bedoya*, 878 F.2d 73, 75–76 (2d Cir.1989). Thus, if a defendant has carried out a scheme involving the importation of 5 kilograms of heroin, it will not help the Government to divide that conduct into five parts making each the subject of a different count in an indictment. Neither will it help the defendant to plead guilty to one count in such an indictment if the Government drops the other four. Whether the conduct is charged in one count, five counts, or five hundred counts, the sentence (assuming appropriate *statutory* limits) will normally be the same. (Thus, a drug case defendant, seeking to benefit from a plea agreement with the Government, would normally have to obtain an agreement about the sentence length, *see* Fed.R.Crim.P. 11(e)(1)(B) & (C), not an agreement to drop related counts. *See* Fed.R.Crim.P. 11(e)(1)(A).)

Recognizing these basic ground rules, appellant simply argues here that the conduct underlying count 5 was *not* part of the same "course of conduct," or "scheme" or "plan" that underlay the first four counts. The question is fact-related. We have reviewed the record, particularly the uncontested statement of facts contained in the Pre-sentence Report, to determine whether or not the district court's conclusion was "clearly erroneous." *See Sklar*, 920 F.2d at 110–11 ("we review such conclusions only for clear error and will not disturb supported findings unless our scrutiny of the record convinces us that a serious mistake was made"). We conclude that it was not.

## II

The Pre-sentence Report describes the conduct underlying the first four counts as follows:

1. On January 25, 1987, Davy Mak was introduced by a cooperating individual to DEA Agent Robert Allen, who was working undercover. At this initial meeting, Mak told Agent Allen that he was associated with an international, heroin trafficking organization based in Hong Kong, which presently did business in four different countries. The organization imported only # 4 heroin, an exceptionally pure form of heroin. The organization did not cut or dilute the heroin which it sold, selling it just as the organization received it. Typically, the heroin came from Thailand and was approximately 86–95% pure. It was packaged in "units," packages of approximately a pound and a half a piece. The organization was capable of bringing in fifty units (approximately 75 lbs.) of heroin on seven to ten days notice.

2. Mak cautioned that he was not prepared to enter into a big deal with Agent Allen right then and there. Before he did anything big with Agent Allen, he thought they needed to get to know each other better. In

addition, Agent Allen would have to travel to Hong Kong to meet with the heads of the organization.

3. Mak was a broker for the organization. He told Agent Allen that he made investments for bosses in the organization. Many of the lower level people in the organization, the people who handled the heroin, knew him only as a real estate broker. To quote Davy Mak in this first meeting: "Nobody really even finds out I am related to this unless I tell them."

4. Mak wanted to arrange a deal on January 25th. To quote what Mak said at this meeting again: "I told (the cooperating individual who introduced Mak to Allen) we have something ... if [Agent Allen] can help us." Davy Mak wanted green cards and re-entry permits for three people. A green card is a slang term for a resident alien registration card. An alien who acquires resident alien status can stay in the United States as long as he wants, travel into and out of the country freely and, if he wants, work here. . . .

5. Mak told Agent Allen that the green cards and re-entry permits were important to the heroin trafficking organization for varying reasons. One was for the head guy for the organization of New York. A second was for a man who was a potential competitor in New York, whom the organization wanted to draw into its own circle so that the organization could manipulate the price of heroin in the Chinese community in New York. The third was for a small distributor in New York, who had been helpful to the organization in making deliveries and in other ways.

6. Mak was prepared to arrange the delivery of heroin to Agent Allen for the immigration documents which the organization needed. . . . After he received the immigration documents, he said that he would go to Hong Kong with Agent Allen to introduce him to the people who would need to know him before they could do a big deal.

7. Over approximately the next two years, Agent Allen provided Mak with a number of green cards and re-entry permits which he requested. In return, Davy Mak arranged on three occasions for associates in Hong Kong to ship heroin to undercover mailboxes used by Agent Allen. In December of 1987, Mak and his associates imported 348.4 grams, of 88% pure heroin; in June of 1988, they imported 348.7 grams of 80% pure heroin; and finally, in September of 1988, they imported 661.8 grams of 82% heroin—a total of 1358.9 grams or approximately 1.36 kilograms of very pure heroin. (At the time, heroin being sold on the street to users was approximately 5% pure.)

8. A few months after Agent Allen began to deliver the immigration documents to Davy Mak, Mak introduced Agent Allen to John Leung. At this first meeting, Mak said that John Leung represented a Hong Kong based trafficking organization. Leung, who did not speak English, offered through Mak to sell Agent Allen twenty units (approximately thirty pounds) of heroin, the sale contingent upon it taking place in Hong Kong. Mak later told Agent Allen that Leung assisted in arranging for the heroin exchange for immigration documents to be shipped from Hong Kong. As late as July, 1989, Mak was still conspiring with John Leung to obtain immigration documents in exchange for heroin, conditioning any heroin dealing from then on with John Leung on the delivery of immigration documents for some of Leung's associates.

The Pre-sentence Report describes the conduct underlying the dropped fifth count as follows:

9. During the course of their relationship, Agent Allen told Mak that he had a contact in the U.S. Customs Service that could assure that large

quantities of drugs be brought into the United States through Logan Airport without detection. It was not cost effective to use this contact to bring in smaller amounts of heroin, even amounts as large as ten units. However, twenty units of heroin or more at a time could be brought in through Logan Airport using his contact. Agent Allen told Mak he was prepared to buy fifty units at a time and to assist in bringing in more if the importers wanted.

10. Mak took up Agent Allen's offer. Allen told Mak that to smuggle the narcotics into the country, the couriers, the people carrying the drugs, would have to fly from Hong Kong or Bangkok via London. In London, the couriers would have to connect flights at London's Heathrow Airport rather than London's Gatwick Airport. If they stayed on the same airline for their flight to Boston, they would not be required to go through customs at Heathrow. Before they left, the couriers would be provided with stickers to identify their suitcases and be shown a hat. One of the men who worked with Agent Allen would be on the flight when the couriers left London and would put on the hat after the flight arrived in Boston so that he could lead them to his Customs contact. The Customs contact would know the drugs were in the suitcases with the stickers and assure that the suitcases were inspected as the couriers carried the heroin through customs in Boston.

11. While the massive heroin importation, which the two discussed, was never accomplished, Mak and his co-conspirators here and abroad had everything in place on June 12 and 13, when the smuggling operation was to take place. The heroin was to come from Bangkok, Thailand. According to Mak, the heroin couriers were to be under the control of a young oriental male who looked Spanish and who travelled under

the alias Robert Silva. His father was one of the suppliers of the heroin. Mak's co-conspirators had sent a hat to Hong Kong to be shown to the couriers so that they would recognize it. Mak gave this hat and stickers similar to those which would be used on the courier's suitcases to Agent Allen. With the assistance of Agent Allen, Mak had the visa permitting Silva to remain in the United States extended. Mak explained that Silva would come up from New York to meet the couriers when the shipment arrived. Mak assured the agent that everything was on schedule and the couriers were on their way. Mak advised that the couriers intended to smuggle twenty units of heroin on June 13, 1989.

12. On June 13, the day the heroin was to arrive, Mak told Agent Allen there had been a problem. They [Mak's associates] had been warned in Bangkok that Thai customs had been notified of the lookout for drugs had been placed on the flight which the couriers were to take [sic]. When they learned of this, the couriers had gotten off the plane.

13. Mak told Agent Allen that he had learned that the plans of the Silva group to import heroin through Logan Airport had been aborted in a call about 2:00 a.m. that morning. The records of the Logan Airport Hilton Hotel show that Robert Silva indeed had a room there that night, and that a call was made from that room to Mak's residence just before 2:00 a.m.

Appellant, looking at these facts, points out that the dropped count covered conduct that took place at a later time, that involved drugs coming from a different place (Bangkok, not Hong Kong), and may have involved a number of different participants. On the other hand, as both the district court and the Government have pointed out, two key participants (the appellant and

Agent Allen) are the same; these two participants, early on in their relationship, discussed the possibility of a later "big deal" (which term describes the later Bangkok import attempt), and immigration "green cards" played a role in all the import efforts.

Ultimately, the matter is one of judgment. And, we simply cannot say that the district court's determination, of a single course of conduct, was "clearly erroneous." *See Sklar*, 920 F.2d at 110 ("considerable deference" given to district court in determining whether drug conduct part of a common scheme or plan); *United States v. Gooden*, 892 F.2d 725, 728–29 (8th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2594, 110 L.Ed.2d 274 (1990) (applying clearly erroneous standard in similar circumstances).

The judgment of the district court is *Affirmed*.