**UNITED STATES, Appellee,**

v.

**Karen DiIORIO, Defendant, Appellant.**

**No. 91–1340.**

United States Court of Appeals,
First Circuit.

Heard Sept. 3, 1991.
Decided Oct. 16, 1991.

William J. Murphy with whom Joseph A. Bevilacqua, Jr., Providence, R.I., was on the brief, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lawrence D. Gaynor, Asst. U.S. Atty., and Lincoln C. Almond, Providence, R.I., U.S. Atty., were on brief, for appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is a Sentencing Guidelines appeal. In November of 1990, a federal grand jury in the district of Rhode Island issued a three-count indictment against the appellant, Karen DiIorio, and a co-defendant, Fernando Cabral. The first count charged DiIorio and Cabral with conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. § 846. The two remaining counts charged them with two separate distributions of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2. In January of 1991, DiIorio entered into a plea bargaining agreement with the government. Appearing before the Honorable Raymond J. Pettine of the District Court for the District of Rhode Island, DiIorio pled guilty to the third count of the indictment, which charged a single distribution of cocaine. At a sentencing hearing held in March of 1991, the district court, acting on the plea agreement, granted the government's motion for dismissal of the first two counts of the indictment. The district court sentenced DiIorio to eighteen months in prison and an additional mandatory three-year period of supervised release.

On appeal, DiIorio raises three challenges to the district court's application of the Guidelines. First, she claims that the district court should have granted a four-level downward adjustment in her offense level because of her "minimal" role in the cocaine distribution. Second, she asserts that in determining her base offense level according to the amount of drugs involved in the transaction, the district court erroneously included an amount of cocaine charged in a count that was dismissed pursuant to the plea bargaining arrangement. Finally, DiIorio argues that the district court erred in its interpretation of the Guidelines when it determined that it had no authority to depart downwards from the applicable sentencing level. We affirm the district court's application of the Sentencing Guidelines.

## I. BACKGROUND AND PROCEDURAL HISTORY

A) *The Offense*

The following facts are set out in the Government's Presentence Report and are undisputed by the appellant. According to that report, on August 30, 1989, a confidential informant of the Drug Enforcement Administration (DEA) arranged for the introduction of appellant DiIorio and her co-defendant Fernando Cabral (Cabral) to two undercover DEA agents, Special Agent John Adams (Adams) and Task Force Agent Lisa Farrell (Farrell). The meeting between Agents Adams and Farrell, the informant, DiIorio and Cabral took place at the T.F. Green State Airport in Warwick, Rhode Island. The group then proceeded to the Marriott Hotel in Providence, Rhode Island, where they continued the meeting. There, Cabral stated that he could supply the agents with various amounts of cocaine on a weekly basis and indicated that the agents could advise the informant of how much cocaine they wished to purchase. In the course of this meeting, DiIorio expressed her concern that the undercover agents were "cops" and declared that all future meetings should be held at the El Inca Restaurant in Providence. Agents Adams and Farrell were already familiar with the El Inca Restaurant as a haven for cocaine trafficking.

About two weeks later, on September 12, 1989, Agents Adams and Farrell met again with Cabral. DiIorio was not present. On this occasion, Cabral offered the undercover agents 2.014 grams of cocaine as a sample of a larger amount to be made available later in the day. This distribution of cocaine provided the basis for the second count of the indictment against DiIorio. That afternoon Cabral met with the undercover agents, again without DiIorio. Cabral gave the agents 198.267 grams of co-

caine and told Agents Adams and Farrell that they would have to pay $4,200 the following day. This second distribution of cocaine was the basis of the third count of the indictment, to which DiIorio ultimately pled guilty.

The following day, September 13, 1989, Agent Farrell met with Cabral, DiIorio and the informant in the parking lot of the Burger King restaurant on Hartford Avenue in Providence. In the presence of DiIorio, Cabral and Agent Farrell discussed a future purchase of cocaine. Cabral then told Agent Farrell to give the informant the $4,200 for the cocaine received the previous day. Agent Farrell gave the money to the informant, and the informant in turn gave the money to Cabral. Cabral then passed the money to DiIorio, and had DiIorio count it. DiIorio then returned the money to Cabral.

After the meeting that day, Agents Farrell and Adams had several conversations with Cabral and DiIorio about the purchase of additional amounts of cocaine. After Cabral and DiIorio ultimately proved unwilling or unable to make other cocaine sales, they were arrested.

## B) *The Sentence*

Following her indictment for three counts of cocaine trafficking, DiIorio entered into a plea bargaining agreement with the government. The government agreed to recommend the dismissal of the first two counts of the indictment—conspiracy to distribute cocaine, and the distribution of the 2.014 gram sample—in return for DiIorio's guilty plea to the third count—distribution of the 198.267 gram amount at the September 13 meeting.

At her sentencing hearing on March 26, 1991, DiIorio's counsel raised several objections to the probation officer's Presentence Report. These objections had been presented to the court earlier in the form of a written objection and were essentially the same claims that she raises in her current appeal, *i.e.*, that she was a "minimal" participant entitled to a four-level downward adjustment in her offense level, that the 2.014 grams of cocaine should not

have been included in the calculation of her base offense level, and that her physical condition, family circumstances, employment record and lack of a criminal record justified a downward departure from the applicable sentencing level. The court declined DiIorio's counsel's offer to further elaborate on her physical condition, and indicated that it was fully aware of her arguments for downward departure.

The district court accepted the probation officer's recommendation that DiIorio's offense level be lowered because of her acceptance of responsibility for her criminal conduct, based on her written statement submitted to the probation officer for purposes of the Presentence Report. The court rejected, however, DiIorio's claim that she was a "minimal" participant in the transaction entitled to a four-level reduction. Instead, it granted the three-level downward adjustment suggested by the probation officer. Although Judge Pettine observed that he did "think that this is a classic case of one who truly is a minimal participant in this whole affair," he considered explicitly the following facts in refusing to grant the full four-level downward adjustment: DiIorio's knowledge of the ongoing nature of Cabral's activities; her fears that the undercover agents might be "cops"; DiIorio's attempts to move the meetings to the El Inca Restaurant; and her counting of the $4,200 payment.

The district court also rebuffed DiIorio's challenge to the aggregation of the 2.014 gram sample in her base offense level, noting that "it was ... all part of the same act and there's no way you can separate one from the other even though she is not charged with it."

The court next considered DiIorio's requests for departure from the eighteen to twenty-four month prison sentence required by the Guidelines. In order to understand the district court's ruling on this claim, it is necessary to explain DiIorio's physical condition and personal history and in particular to consider DiIorio's statement in the Presentence Report acknowledging responsibility for her crime. In that statement, DiIorio attributes part of

her conduct to the fact that she is severely disfigured as a result of burn injuries suffered in her childhood. DiIorio describes how at the age of eight she was involved in a tragic accident in which she was burned over seventy per cent of her body. According to DiIorio, the accident left her "scarred for the rest of my life both mentally and physically." Because of her disfigurement, DiIorio "did not have what one may call a normal high school social life." When she later became romantically involved with her co-defendant Fernando Cabral, DiIorio says that this relationship provided her with something she "had never experienced[;] the feeling that someone [was] giving me love, affection and a sense of being wanted as a young lady." Because Cabral gave her "something in life that I never experienced," and "was a very compassionate and loving person with me," DiIorio claims that her actions in the drug transactions "were blinded by my love for Fernando." DiIorio states that she did not know where the drugs came from, or how Cabral had obtained them, and adds that "I did what I did with Fernando because my love for him blinded me to the point where I didn't realize the significance of the harm I was doing."

The Report also excerpts from a letter from her physician and surgeon, Dr. Joel J. Feldman, a faculty member of the Harvard Medical School who teaches at Massachusetts General Hospital. Dr. Feldman's letter describes DiIorio's "great fortitude" and "precocious maturity and ... dignity" in enduring a long series of reconstructive surgeries while an adolescent. While it indicates the need for additional reconstructive surgery, Dr. Feldman's letter does not specify any imminent requirement of treatment for DiIorio.

The Presentence Report examines and rejects DiIorio's family circumstances, mental and emotional health, and employment record as possible grounds for departure. The Report outlines DiIorio's family background, the recent divorce of her parents, and chemotherapy treatment of her mother for cancer. It also notes her four years of continuous employment as a recep-

tionist/secretary in a Providence business of which her father is a vice-president.

After considering the information presented in the Presentence Report, the district court rejected DiIorio's argument that it should depart downwards from the Guidelines. The court found that there was "nothing in the act" that justified departure from the Guidelines on the basis of DiIorio's physical condition, family ties or employment history. Judge Pettine made it clear, however, that to apply the Guidelines under the circumstances of DiIorio's case caused him great personal anguish. After faulting the Sentencing Guidelines as a "push button" system of justice, Judge Pettine observed:

If I came on this bench as a free agent today, this lady would not go to jail because I believe her story, and I believe what I think actually happened to her psychologically. She anchored herself to this man ... and anyone with any understanding of human nature and out of the motivation of the young and the emotions that the young go through [ ] would realize that she found in him a form of expression that she was afraid that she would never have for the rest of her life, and she became indeed a puppet. That's what she was, a puppet.... [I]t's a sad case and it's sad because I as a judge who sits here on this bench, who is supposed to dispense justice in keeping with his conscience finds himself pulled as though he were a puppet forced to go one way and that is to adhere to the guidelines and this is one time the guidelines are all wrong.

Now, I cannot articulate in writing these reasons and expect an appellate court to uphold them. The appellate court wouldn't listen to them for one five [sic] minutes because it doesn't fall in the category of exceptional circumstances ... that the learned mind can set forth as justifying a departure, a downward departure.

After this statement, the district court sentenced DiIorio in accordance with the Presentence Report of the probation officer. The applicable sentencing range was eighteen to twenty-four months. The court

sentenced DiIorio to eighteen months in prison and to a mandatory three-year period of supervised release.

## II. DISCUSSION

Our jurisdiction over this appeal is based on 18 U.S.C. § 3742(a), which provides for review of an otherwise final sentence if the sentence "was imposed as a result of an incorrect application of the sentencing guidelines...." 18 U.S.C. § 3742(a)(2).

### A) *The Role in the Offense Adjustment*

█ We first review DiIorio's contention that the district court erred when it failed to award her a four-level downward adjustment under section 3B1.2(a) of the Guidelines.[1] In this circuit, a district court's determination under section 3B1.2 of whether a defendant had a "minor" or "minimal" role in an offense will be reversed only for clear error. *United States v. Rosado–Sierra,* 938 F.2d 1, 1–2 (1st Cir. 1991); *United States v. Trinidad De La Rosa,* 916 F.2d 27, 29 (1st Cir.1990); *United States v. Ocasio,* 914 F.2d 330, 332–33 (1st Cir.1990); *United States v. Paz Uribe,* 891 F.2d 396, 399 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990); *United States v. Wright,* 873 F.2d 437, 444 (1st Cir.1989). It is true that adjustments under the Guidelines that hinge on the defendant's role in the offense present a mixed question of law and fact that could plausibly be subjected to a more intensive form of appellate review. But because of the " 'essentially factual' " nature of a district court's inquiry into the individual circumstances of a defendant's case, we apply a clearly erroneous standard to decisions governing role-in-the-offense appeals. *See Wright,* 873 F.2d at 444 (citations omitted).

█ Under this standard of review, a district court's determination under the Guidelines of a defendant's role in an offense cannot be clearly erroneous where it is based on a reasonable inference drawn from the undisputed facts. *Rosado–Sierra,* 938 F.2d at 1–2; *Trinidad De La Rosa,* 916 F.2d at 29. The commentary to section 3B1.2 of the Guidelines suggests that the full four-level adjustment for a defendant's "minimal" role is most appropriate where the defendant is "plainly among the least culpable of those involved in the conduct of a group," and where the defendant "lack[s] knowledge or understanding of the scope and structure of the enterprise and of the activities of others...." U.S.S.G. § 3B1.2, comment. (n.1).[2] After reviewing the facts underlying DiIorio's claim that she should have been classified a "minimal" participant in the offense to which she pled guilty, we have little difficulty in concluding that the district court's decision not to grant a four-level downward adjustment was reasonable.

Here, the facts underlying DiIorio's conviction show that DiIorio was well aware that Cabral hoped to arrange distributions of cocaine on a weekly basis. The fears that she expressed that the undercover agents might be "cops," and attempts to have future meetings conducted at an establishment known to be a haven for cocaine trafficking, belie any claim that she lacked "knowledge or understanding of the scope and structure" of Cabral's activities. Her subsequent appearance at the meeting at which the agents paid for the drugs provided by Cabral, and her counting of the money received for that transaction, support the court's finding that she was not merely a "minimal" participant.

---

1.  Section 3B1.2 permits a downward adjustment as follows:
    (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
    (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels. In cases falling between (a) and (b), decrease by 3 levels.
    U.S.S.G. § 3B1.2.

2.  The section 3B1.2 commentary continues:
    It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment....
    U.S.S.G. § 3B1.2, comment. (n.2).

Furthermore, the Guideline commentary to section 3B1.2 emphasizes that a "minimal" participant is ordinarily a defendant who has been involved only in a single transaction.[3] The facts in DiIorio's case demonstrate that although DiIorio was plainly less culpable than Cabral, she nonetheless acted as Cabral's "loyal lieutenant" in the transaction, and intended to play that role in future meetings and distributions. Indeed, DiIorio participated in conversations with undercover agents about future purchases. DiIorio's challenge to the district court's choice of role-in-the-offense adjustment is therefore rejected.

B) *Aggregation of Additional Amounts in Sentencing*

DiIorio next attacks the district court's inclusion of the 2.014 gram sample in calculating her base offense level. This calculation resulted in her being sentenced at a higher base offense level than would otherwise have been applicable had the 198.267 gram amount of the third count been used exclusively in determining DiIorio's base offense level.[4] DiIorio argues that this amount should not have been considered because it was charged in a count of the indictment later dismissed by the government pursuant to the plea agreement.

This claim raises the issue of the proper interpretation of the "Relevant Conduct" provision of the Guidelines, which instructs a district court to include in determining a defendant's offense conduct level for drug offenses all "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In our decisions interpreting the language of this section of the Guidelines, we have relied on the pertinent commentary, which states that

in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they

were part of the same course of conduct or part of a common scheme or plan as the count of conviction.

U.S.S.G. § 1B1.3, comment. (backg'd). *See United States v. Mak*, 926 F.2d 112, 113 (1st Cir.1991); *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990); *United States v. Mocciola*, 891 F.2d 13, 16 (1st Cir.1989); *United States v. Blanco*, 888 F.2d 907, 909 (1st Cir.1989).

We review the application of section 1B1.3 by sentencing courts only for clear error. *Sklar*, 920 F.2d at 110; *Mocciola*, 891 F.2d at 16. We also note that we have repeatedly upheld the inclusion for sentencing purposes of uncharged drugs involved in the "same course of conduct or part of a common scheme or plan as the count of conviction." *See Mak*, 926 F.2d at 113–16 (drug amounts charged in dismissed count properly used for sentencing purposes); *Sklar*, 920 F.2d at 111–12 (repeated receipt of drug shipments extrapolated from defendant's receipt of single shipment properly considered in sentencing as single course of conduct); *Mocciola*, 891 F.2d at 16 (firearms possession acquittal and uncharged cocaine relevant to sentencing); *Blanco*, 888 F.2d at 909–11 (cocaine in dismissed counts part of same course of conduct).

DiIorio candidly concedes the district court's authority to consider uncharged drugs for sentencing purposes that are part of the "same course of conduct or common scheme or plan as the offense of conviction." She argues, however, that Cabral's distribution of the 2.014 gram amount occurred without her knowledge or participation. Therefore, she maintains, it is unfair to attribute that amount to her for sentencing purposes. DiIorio cites *United States v. Wood*, 924 F.2d 399 (1st Cir.1991), for the proposition that a drug transaction carried out by a drug defendant's accomplice without the defendant's knowledge should not be a factor in the defendant's sentence.

---

**3.** *See supra* note 2.

**4.** Section 2D1.1 of the Guidelines, which governs "Offenses Involving Drugs," assigns different base offense levels to crimes involving 100 to 200 grams of cocaine, and crimes involving 200 to 300 grams. *See* U.S.S.G. § 2D1.1(c)(12), (13).

In *Wood,* the defendant was found guilty of conspiracy to distribute cocaine. We found that under section 1B1.3, the sentencing court could properly have considered three uncharged transactions in which Wood delivered cocaine from a source in New York and delivered it to his wife in Maine. *Id.* at 404. We rejected, however, the sentencing court's decision to include in Wood's offense level a transaction carried out by his wife without his knowledge. *Id.* That transaction between Wood's wife and a drug supplier settled part of a debt by Wood to that supplier. The district court reasoned that because this transaction by Wood's wife resulted in a benefit to Wood himself, it would be appropriate to include in Wood's sentencing the amount of drugs involved in his wife's transaction with the drug supplier. We rejected this approach and held that it would be too broad an interpretation of section 1B1.3 to hold Wood accountable for his wife's dealings:

> Wood's only connection with the ... transaction was as a beneficiary of someone else's criminal activity, a link that had nothing to do with *his* conduct. To significantly increase Wood's sentence based on a transaction in which he took no part strikes us as ... [a step that] could not have been contemplated as within [section 1B1.3(a)(2) ].

*Id.* at 404 (emphasis in the original). Accordingly, we vacated Wood's sentence and remanded for resentencing.

■ In this case, we cannot conclude that it was clear error for the district court to consider the 2.014 gram sample in DiIorio's sentencing. DiIorio was not only an active participant at the initial meeting with the undercover agents in which Cabral proposed deliveries of cocaine on a weekly basis, but also helped plan and execute the 198.267 gram transaction that underlies her conviction. It is true that DiIorio was not present at the time of Cabral's delivery of the initial sample and was again absent at the delivery of the balance of the cocaine. The following day, however, she was present to count the money received for the purchase of the amounts of cocaine.

We think it a reasonable finding under section 1B1.3 that the 2.014 gram sample was "part of the same course of conduct or common scheme or plan as the offense of conviction" committed by DiIorio. Unlike the separate transaction consummated by Wood's wife, the delivery of the 2.014 gram sample was directly related to DiIorio's *own* offense conduct—the sale of the 198.-267 grams to which she admits participation. It is fair to consider the delivery of a 2.014 gram sample (for which, we note, Cabral sought no payment) a direct antecedent to the sale of the much larger amount of cocaine. In *Wood,* the court was presented with two essentially discrete transactions involving different buyers and sellers. Here, however, the two different distributions were essentially related stages of the same transaction.

Furthermore, given DiIorio's extensive participation in the planning of the entire transaction, and in the collection of its proceeds, we think that the sentencing court could reasonably have concluded that DiIorio knew about Cabral's delivery of the sample. In this respect DiIorio's case stands in stark contrast to *Wood,* in which it was acknowledged by the government that defendant had absolutely no knowledge of his wife's dealings with other dealers. Here, DiIorio knew about the terms of the deal arranged with Agents Farrell and Adams and was aware that the particular transaction that they had contemplated had been successfully concluded. It is therefore a reasonable inference that she knew about the actual delivery of the drugs by Cabral.

In sum, where DiIorio probably had knowledge of Cabral's distribution of the sample, and where the delivery of the sample and DiIorio's offense conduct were closely linked, we think that the district court could reasonably have considered the 2.014 gram sample part of the "same course of conduct" under section 1B1.3(a)(2).

C) *The Sentencing Court's Refusal to Depart Downwards*

■ We next consider DiIorio's contention that the district court wrongly conclud-

ed that it lacked authority to depart from the sentencing level mandated by the Guidelines. Chapter Five, Part H of the Guidelines permits departure from the sentencing range based on "Specific Offender Characteristics." This part provides, inter alia, that in extraordinary circumstances the offender's physical condition may be considered in a court's determination of an appropriate sentence:

> Physical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines or where within the guidelines a sentence should fall. However, an extraordinary physical impairment may be a reason to impose a sentence other than imprisonment.

U.S.S.G. § 5H1.4. Similarly, in highly exceptional cases, an offender's previous employment record [5] and family or community ties [6] may be considered in the determination of sentence. DiIorio maintains that the district court misunderstood its authority to apply these provisions. As a consequence, she argues, her physical condition, family ties, employment history and lack of a criminal record were not properly considered as extraordinary and unusual circumstances justifying departure from the Guidelines during her sentencing.

DiIorio acknowledges the settled law of this circuit that "ordinarily, a district judge's refusal to depart, regardless of the suggested direction, is not appealable." *United States v. Romolo*, 937 F.2d 20, 23 (1st Cir.1991). *See also United States v. Isabel*, 945 F.2d 1193, 1204–05 (1st Cir. 1991); *United States v. Harotunian*, 920 F.2d 1040, 1044 (1st Cir.1990); *United States v. Sanchez*, 917 F.2d 607, 613 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991); *United States v. Ruiz*, 905 F.2d 499, 508–09 (1st Cir.1990); *United States v. Tucker*, 892 F.2d 8, 10–11 (1st Cir.1989). But, as DiIorio points out, it is also well recognized in

this circuit that "appellate jurisdiction may attach in those few situations where the lower court's decision not to depart is based on the court's mistaken view that it lacks the legal authority to consider a departure." *Romolo*, 937 F.2d at 22–23. *See also United States v. Rushby*, 936 F.2d 41, 42 (1st Cir.1991) ("we can review a district court's determination that it is without power to depart"); *United States v. Castiello*, 915 F.2d 1, 5–6 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991); *United States v. Russell*, 870 F.2d 18, 20–21 (1st Cir.1989).

Consequently, in order for us to have jurisdiction over DiIorio's claim that the district court should have departed from the Guidelines on the basis of her physical condition and other personal circumstances, we must find that the court misunderstood its authority to depart under the Guidelines. Only then can we consider the issue of the proper interpretation of the departure provisions of the Guidelines as applied to DiIorio. If, on the other hand, we find that the court adequately understood its power to depart from the Guidelines, and yet declined to exercise that power, DiIorio's claim automatically fails because we lack the jurisdiction to consider it.

We think that the full record in this case—including the Presentence Report, DiIorio's written memorandum of objection to that report, and the complete transcript of the sentencing hearing—makes it evident that the district court was fully apprised of its discretion to depart from the Guidelines. DiIorio points to the following statements by Judge Pettine as evidence of his lack of understanding of his authority to depart:

> If I came on this bench as a free agent today, this lady would not go to jail because I believe her story, and I believe

**5.** Section 5H1.5 provides:
Employment record is not ordinarily relevant in determining whether a sentence should be outside the guidelines or where within the guidelines a sentence should fall. Employment record may be relevant in determining the type of sentence to be imposed when the guidelines provide for sentencing options.

U.S.S.G. § 5H1.5.

**6.** Section 5H1.6 applies to "Family Ties and Responsibilities, and Community Ties": "Family ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside the guidelines." U.S.S.G. § 5H1.6.

what I think actually happened to her psychologically[;]

and

it's a sad case and it's sad because I as a judge who sits here on this bench, who is supposed to dispense justice in keeping with his conscience finds himself pulled as though he were a puppet forced to go one way and that is to adhere to the Guidelines and this is one time the Guidelines are all wrong.

When read in conjunction with the full record of this appeal, however, these statements do not, as DiIorio suggests, indicate a lack of understanding by the district court of its discretion to depart under the Guidelines. Rather, we think it apparent from this record that the court understood its authority to depart downwards, and yet concluded regretfully that the specific provisions of the Guideline that DiIorio wished to invoke simply did not permit departure under the circumstances of her case.

Review of the chronology of the record supports this characterization of the district court's sentencing determination. In the first place, the Presentence Report specifically discusses and rejects as "Factors That May Warrant Departure" DiIorio's physical condition, lack of criminal history, family and community ties, and employment record. These factors were again discussed in DiIorio's memorandum in objection to the Presentence Report, which makes explicit reference to the provisions in the Guidelines governing departure on the basis of physical condition (§ 5H1.4), employment record (§ 5H1.5), and family ties (§ 5H1.6). These particulars were orally presented for a second time to the district court at the sentencing hearing. In fact, Judge Pettine cut off this redundant presentation when DiIorio's counsel offered to describe her physical condition. He stated:

I've read the document; I've read her statement and I've read your memorandum and I'm well familiar with what you're saying and what you are doing is you are repeating pretty much what you've already put in writing.

Against this background, we note specifically the court's ruling on DiIorio's request for departure:

As far as the departure because of the physical condition, there is nothing that would warrant my doing that. There is nothing that I could look to to justify doing that as there is nothing in the act that would permit me to go to a downward adjustment because of her family ties and her employment.

We think this statement shows that although the court was well aware of the factors that might in extraordinary circumstances permit it to depart from the Guidelines, it concluded that DiIorio's case did not fit those requirements. The district court was experienced in the application of the Guidelines, and explicitly considered its discretion to depart downwards. *Cf. United States v. Russell,* 870 F.2d 18, 20 (1st Cir.1989) (finding that district court misunderstood its discretion to depart partially premised on court's limited experience with Guidelines). Given the sympathetic circumstances the district court found in this case, it is quite evident that had the court been able to find an adequate justification for departure, it would have done so. We therefore see nothing in the record of DiIorio's sentencing that would disturb "[o]ur usual presumption ... that a district court is aware of the law that it is called upon to apply." *Id.*

Because we find that the district court chose not to exercise its discretion to depart downwards from the sentencing level required by the Guidelines, we lack jurisdiction to consider DiIorio's arguments for departure on the basis of her physical condition, family ties, employment record and lack of a criminal history.

## CONCLUSION

The district court's application of the Sentencing Guidelines is in all respects *Affirmed.*