UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1847

UNITED STATES OF AMERICA,

Appellee,

v.

TELEX LEBLANC,

Defendant-Appellant.

No. 93-1848

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

TELEX J. LEBLANC,

Defendant-Appellee.

No. 93-1998

UNITED STATES OF AMERICA,

Appellant,

v.

RICHARD E. WEINSTEIN,

Defendant-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Cyr, Circuit Judge.

Frances L. Robinson with whom Davis, Robinson & White,

Thomas Drechsler and Finneran, Byrne, Drechsler & O'Brien were on

brief for Telex J. LeBlanc.
Brian T. Kelly, Assistant United States Attorney, with whom

Donald K. Stern, United States Attorney, and Fred M. Wyshak II,

Assistant United States Attorney, were on brief for United States
of America.
Kenneth I. Seiger, by Appointment of the Court, for appellee

Richard E. Weinstein.

May 24, 1994

-2-

TORRUELLA, Circuit Judge. In this opinion, we address

sentencing issues which are consolidated from three appeals. In

United States v. LeBlanc and United States v. Weinstein, the

Government has appealed the district court's decision to depart

downward from the applicable Sentencing Guideline range. In both

cases, the district court ruled that, in essence, the illegal

conduct of Telex J. LeBlanc and Richard E. Weinstein was

bookmaking, and therefore, it was more appropriate to sentence

them pursuant to guidelines established for operating an illegal

gambling business, rather than pursuant to the money laundering

guidelines, which were applicable to the crimes to which both

LeBlanc and Weinstein had pled guilty. For the following

reasons, we reverse and remand the cases to the district court

for resentencing.

In a cross-appeal, LeBlanc v. United States, LeBlanc

claims that the district court erred in its decision not to

depart downward from the Sentencing Guidelines based on LeBlanc's

medical condition. We dismiss this appeal for want of appellate

jurisdiction.

I. THE GOVERNMENT'S APPEALS

A. BACKGROUND

We view the facts as set forth in the indictment to

which the defendants pled guilty, and in unobjected to portions

of their respective Presentence Reports ("PSR"). See United

States v. Fox, 889 F.2d 357, 358 (1st Cir. 1989); Kerrigan v.

United States, 644 F.2d 47, 49 (1st Cir. 1981).

-3-

1. Telex J. LeBlanc

LeBlanc and two other individuals, Stephen Dickhaut and

William Byrne, operated an illegal gambling business during the

years 1986 through 1990. Essentially, LeBlanc was convicted of

money laundering based upon his acceptance and negotiation of

checks from gamblers who bet on various sporting events through

the bookmaking business. LeBlanc was an "agent" for his two

codefendants who "owned" the business, and LeBlanc had his own

"customers" for whom he received commissions.

The gamblers' checks were usually made payable to

fictitious payees and were in amounts less than $10,000. For

instance, one gambler settled a gambling debt with LeBlanc and

his codefendants by giving them four cashier's checks from the

First National Bank of Boston, all dated November 26, 1990, and

each in the amount of $8750. These cashier's checks were payable

to a fictitious payee, "J. Johnson." LeBlanc personally

negotiated one of these cashier's checks at Baybank Boston on

November 27, 1990.

On November 12, 1992, a federal grand jury returned a

seventeen-count indictment against LeBlanc. Count One charged

that between 1986 and 1990, LeBlanc and two other individuals

conspired to violate money laundering and currency transaction

laws in violation of 18 U.S.C. 371. Counts Two through Four,

and Counts Eight through Sixteen, charged LeBlanc and his

codefendants with various substantive money laundering crimes

including violations of 18 U.S.C. 1956 and 1957, as well as 31

-4-

U.S.C. 5324.

On January 25, 1993, LeBlanc pled guilty to Counts One,

Two, Nine, Eleven, Twelve, Fifteen and Sixteen of the indictment.

LeBlanc's guilty pleas were entered pursuant to a plea agreement

with the Government, in which LeBlanc agreed that he had in fact

violated the money laundering statutes specified in the

indictment.

The Probation Department then issued its PSR, which

indicated that, based upon sentencing "grouping" rules, LeBlanc

should be sentenced for money laundering, based upon his guilty

plea to 18 U.S.C. 1956(a)(1)(B)(i) and (ii).1 Therefore, the

offense level, as set forth in U.S.S.G. 2S1.1, should have been

23.2 The Government suggested that after a three level decrease

in offense level for acceptance of responsibility and a three

1 Because all of the counts to which LeBlanc pled guilty
involved substantially the same harm, the counts were to be
"grouped" together pursuant to U.S.S.G. 3D1.2(d). The
sentencing guidelines applicable to the specific money laundering
offenses to which LeBlanc pled guilty were U.S.S.G. 2S1.1-.3.
U.S.S.G. 2S1.1(a)(2) establishes a base offense level of 20 for
laundering monetary instruments in violation of 18 U.S.C.
1956(a)(1)(B)(i) and 18 U.S.C. 1956(a)(1)(B)(ii). U.S.S.G.
2S1.2(a) establishes a base offense level of 17 for violations of
18 U.S.C. 1957. U.S.S.G. 2S1.3(a)(1)(A) establishes a base
offense level of 13 for structuring transactions in violation of
31 U.S.C. 5324. According to U.S.S.G. 3D1.3, the Guideline
section with the highest offense level must be utilized to
calculate the Guideline range for these money laundering crimes.
Under either U.S.S.G. 3D1.3(a) or (b), the highest offense
level (i.e. 20) should have been applied to LeBlanc.

2 In the plea agreement, the Government stipulated that the
value of the funds involved in the counts to which LeBlanc pled
guilty was less than $600,000. Pursuant to U.S.S.G.
2S1.1(b)(2)(D), three points were added to the base offense level
of 20 because the value of the funds exceeded $350,000.

-5-

point decrease in offense level for LeBlanc's mitigating role,

the final total offense level should be 17 with a guideline range

of 24-30 months' incarceration.

On June 25, 1993, the district court held a final

disposition hearing. At this hearing, the court found that the

conduct attributable to LeBlanc was essentially that of a

bookmaker, who took sporting bets from bettors. His status as a

"money launderer" arose solely by virtue of the fact that bets

were placed with him by check, and these checks were subsequently

either negotiated by him or turned over to Dickhaut and Byrne to

be negotiated by them. The court stated that LeBlanc's case

involved behavior that fell outside of the "heartland" of a

typical money laundering offense and, therefore, warranted a

downward departure from the otherwise applicable Guideline range.

The court then ruled that the Guideline section established for

operating an illegal gambling business was more appropriate, and

proceeded to sentence LeBlanc to 12 months' incarceration

pursuant to U.S.S.G. 2E3.1, which sets forth an offense level

of 12 and a corresponding Guideline range of 10 to 16 month's

incarceration for an individual with a Criminal History Category

of I.

2. Richard E. Weinstein

Weinstein operated an illegal gambling business from

1986 to 1991. In January 1988, Weinstein began accepting large

sports bets from a gambler named Elliot Mael. In order to gamble

through Weinstein, Mael would call Weinstein's beeper and leave a

-6-

code number representing Mael. Weinstein would then call Mael

and accept his wagers. Mael would "settle" with Weinstein on a

weekly basis, and usually exchanged cash.

In October 1988, Mael owed Weinstein approximately

$200,000 in gambling debts. To satisfy part of this debt, Mael

paid Weinstein $75,000 in cashier's checks. Pursuant to

Weinstein's instructions, Mael made nine cashier's checks payable

to Brockton Financial Services rather than to Weinstein. The

nine cashier's checks were issued by the Bank of New England, and

were all dated October 14, 1988. Weinstein then gave these

cashier's checks to another bookmaker, James Katz, who cashed

them at Brockton Financial Services. The checks were structured

so as to avoid currency reporting requirements applicable to cash

transactions exceeding $10,000 -- eight checks were for $9,000

and one check was for $3,000.

On November 12, 1992, a federal grand jury returned a

five-count indictment against Weinstein. Count One charged that

between 1986 and 1991, Weinstein and others conspired to violate

money laundering and currency transaction laws in violation of 18

U.S.C. 371. Counts Two, Three and Four charged Weinstein with

various substantive money laundering crimes, including violations

of 18 U.S.C. 1956 and 1957, as well as 31 U.S.C. 5324. On

March 4, 1993, Weinstein pled guilty to Counts One through Four

of the indictment. Weinstein's guilty pleas were entered

pursuant to a plea agreement with the Government in which

Weinstein agreed that he had in fact violated the money

-7-

laundering statutes specified in the indictment.

The Probation Department then issued its PSR, which

indicated that, based upon sentencing "grouping" rules, Weinstein

should be sentenced for money laundering, based upon his guilty

plea to 18 U.S.C. 1956(a)(1)(B)(i) and (ii).3 Therefore, the

base offense level, as set forth in U.S.S.G. 2S1.1(a)(2),

should have been 20. The Government suggested that after a three

level reduction for acceptance of responsibility, as well as an

additional two level reduction for his mitigating role in the

overall conspiracy, the applicable offense level was 15,

corresponding to a sentencing range of 21-27 months.

On August 5, 1993, the district court sentenced

Weinstein. The court departed from the applicable money

laundering Guideline range because the court found that

Weinstein's behavior essentially constituted bookmaking, and

therefore fell outside of the "heartland" of a typical money

laundering offense. The court instead adopted a reduced

sentencing range based on 2E3.1, which is applicable for

operating an illegal gambling business, and which sets forth an

offense level of 12 and a corresponding Guideline range of 12 to

18 months' incarceration for an individual with a Criminal

History Category of II. The court then sentenced Weinstein to 12

months' incarceration.

B. STANDARD OF REVIEW

3 The sentencing grouping rules operate the same way as in
LeBlanc's case to arrive at this conclusion. See supra note 1.

-8-

The first issue that we must determine is the

appropriate standard of review on appeal. Generally, appellate

review of a sentencing decision involves three questions: 1) are

the departure related circumstances of a sort that the sentencing

court can appropriately rely upon to justify its departure; 2)

does the record support a finding of fact establishing the

existence of such circumstances; and 3) does the record support

the "direction and degree" of departure. United States v.

M ndez-Col n, No. 93-1346, slip. op. at 3 (1st Cir. Jan. 19,

1994); United States v. D az-Villafa e, 874 F.2d 43, 49 (1st

Cir.), cert. denied, 493 U.S. 862 (1989). In United States v.

Rivera, 994 F.2d 942 (1st Cir. 1993), we elaborated on the

appropriate standard of review which we would employ to address

certain sentencing departure issues.

Plenary review is . . . appropriate where
the appellate court, in deciding whether
the allegedly special circumstances are
of a "kind" that permits departure, will
have to perform the "quintessentially
legal" function . . . of interpreting a
set of words, those of an individual
guideline, in light of their intention or
purpose, in order to identify the nature
of the guideline's "heartland" (to see if
the allegedly special circumstance falls
within it).

Id. at 951 (citations omitted). Thus, where departure decisions

"reflect a determination of the purpose of, or an interpretation

of the language in, a guideline or statute, plenary review is

appropriate." United States v. Rosales, No. 92-1732, slip. op.

at 16 (1st Cir. March 31, 1994) (internal quotations omitted)

(citation omitted).

-9-

The district court issued a Sentencing Memorandum to

support its downward departure in United States v. LeBlanc, 825

F. Supp. 422 (D. Mass. 1993). We quote this memorandum at

length, in order to have a complete understanding of the basis

for the district court's decision:

Congress has empowered district courts to
impose a sentence outside the guideline
range when the court finds "that there
exists an aggravating or mitigating
circumstance of a kind, or to a degree
not adequately taken into consideration
by the Sentencing Commission in
formulating the guidelines." l8 U.S.C.
3553(b); U.S.S.G. 5K2.0. This case
presents just such a circumstance. It
involves behavior that falls outside of
the "heartland" of a typical money
laundering offense. . . .

Here, LeBlanc acted as a bookmaking
agent, an offense for which the
guidelines set forth a base offense level
of 12. It is difficult for this court to
conceive of gambling being conducted or
transacted in any form other than by
money or monetary instruments. Yet, by
participating in conduct which calls for
a base offense level of 12, LeBlanc was
charged with money laundering, which
calls for an offense level of 17, given
LeBlanc's acceptance of responsibility.
In essence, LeBlanc finds himself facing
a sentence far in excess of that which is
commensurate with his actual conduct.

While LeBlanc's conduct may technically
constitute money laundering -- an offense
to which he has pled guilty -- this court
finds that sentencing him pursuant to the
strictures of the money laundering
statute would present an inequity not
adequately taken into consideration by
the Sentencing Commission. See [Rivera,

994 F.2d at 947-49]; cf. United States v.

Edgmon, 952 F.2d 1206, 1214 (10th Cir.

1991)("Congress aimed the crime of money
laundering at conduct that follows in

-10-

time the underlying crime rather than to
afford an alternative means of punishing
the prior 'specified unlawful
activity'"), cert. denied, 112 S.Ct.

3037. LeBlanc took checks from bettors
and either negotiated them himself or
turned them over to his supervisors,
Dickhaut and Byrne. When all of the
verbiage and terminology in the
indictment are stripped away, that is the
sum and substance of the conduct for
which he was charged. Accordingly, this
court finds that a 5 level downward
departure is warranted, resulting in an
offense level of 12.

United States v. LeBlanc, 825 F. Supp. at 423-24.

In United States v. Weinstein, 828 F. Supp. 3 (D. Mass.

1993), the court, citing LeBlanc, based its downward departure on

an identical rationale. The court reiterated its belief that

because it could not conceive of a manner in which gambling

operations could be conducted without the exchange of money,

application of the money laundering statute to someone who is a

bookmaker would always result in a simultaneous application of

the money laundering statutes, which would be an impermissible

"alternative means of punishing the prior specified unlawful

activity." Weinstein, 828 F. Supp. at 5.

In both cases, the sentencing court suggested that

money laundering offenses that stem from the prior specified

unlawful activity of operating an illegal gambling business fell

outside of the "heartland" of the money laundering guidelines.

The court's decisions were not factually tied to the specifics of

the cases of LeBlanc or Weinstein. Rather, the decisions were

categorical, legal conclusions centered on the intent and scope

-11-

of the money laundering statutes, and thereby, the nature of the

applicable sentencing guideline's heartland. This was a

quintessentially legal question, and as such, subject to plenary

review.

C. THE DEPARTURE DECISION

We first review the district court's departure

decisions to determine whether the departure-related

circumstances it relied upon to depart downward were appropriate,

and more specifically, whether the conduct of LeBlanc and

Weinstein fell outside of the heartland of a typical money

laundering case. The Government contends that the court

construed the scope of 18 U.S.C. 1956 much too narrowly. It

claims that the actions of LeBlanc and Weinstein ran afoul of the

money laundering statute, and both so admitted by pleading

guilty. Therefore, the Government argues, the court should have

sentenced them pursuant to the money laundering guideline.

LeBlanc and Weinstein contend that the court correctly

concluded that their cases were atypical of the usual money

laundering case, and that their illegal conduct was simply

gambling. Thus, LeBlanc and Weinstein argue that the court

properly found that it would be inequitable to sentence them

pursuant to the money laundering guideline, and rightfully

departed downward.

To determine the applicable sentence, a court should

first determine the offense guideline section most applicable to

the offense of conviction, which is "the offense conduct charged

-12-

in the count of the indictment . . . of which the defendant was

convicted." U.S.S.G. 1B1.2. Both LeBlanc and Weinstein pled

guilty to violations of 18 U.S.C. 1956 and 1957, as well as 31

U.S.C. 5324. For sentencing purposes, the operative counts in

the indictments charged that LeBlanc and Weinstein violated 18

U.S.C. 1956(a)(1)(B)(i) and (ii).4

To determine the nature of the crime of money

laundering, and therefore the scope of the "heartland" of the

corresponding sentencing guideline, we look, in part, to the

language of the statute and the legislative history associated

with it. 18 U.S.C. 1956 provides in pertinent part:

(a)(1) Whoever, knowing that the property
involved in a financial transaction
represents the proceeds of some form of
unlawful activity, conducts or attempts
to conduct such a financial transaction
which in fact involves the proceeds of
specified unlawful activity -

(B) knowing that the transaction is
designed in whole or in part -

(i) to conceal or disguise the nature,
the location, the source, the ownership,
or the control of the proceeds of
specified unlawful activity; or

(ii) to avoid a transaction reporting
requirement under State or Federal law,

shall be sentenced to a fine . . . or

4 This is so because the counts to which LeBlanc and Weinstein
pled guilty involved substantially the same harm, and therefore
the counts were grouped together. U.S.S.G. 3D1.2(d). The
sentencing grouping rules mandate that a defendant be sentenced
pursuant to the guideline section with the highest offense level.
U.S.S.G. 3D1.3. In this case, the applicable guideline section
is U.S.S.G. 2S1.1(a)(2), which establishes a base offense level
for laundering monetary instruments.

-13-

imprisonment . . . or both.

This statute was enacted as part of the Money Laundering Control

Act of 1986. See S. Rep. No. 433, 99th Cong., 2d. Sess. (1986);

H.R. Rep. No. 855, 99th Cong., 2d. Sess., pt. 1 (1986). The

legislative history associated with 1956 indicates that

Congress designed the statute to fill "the gap in the criminal

law with respect to the post-crime hiding of ill-gotten gains,"

and intended money laundering to be a separate crime distinct

from the underlying offense that generated the money. United

States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992) (citation

omitted); United States v. Edgmon, 952 F.2d 1206 (10th Cir.

1991), cert. denied, 112 S. Ct. 3037 (1992); United States v.

Lovett, 964 F.2d 1029 (10th Cir.), cert. denied, 113 S. Ct. 169

(1992); see also United States v. Stavroulakis, 952 F.2d 686, 691

(2d Cir.), cert. denied, 112 S. Ct. 1982 (1992). Congress aimed

1956 "at conduct that follows in time the underlying crime

rather than to afford an alternative means of punishing the prior

'specified unlawful activity.'" Johnson, 971 F.2d at 569.

As noted by the district court, the "classic" money

laundering case is where "a drug trafficker collects large

amounts of cash from drug sales and, acting with the complicity

of a banker or other person in a financial institution, deposits

the drug proceeds in a bank under the guise of conducting a

legitimate business transaction." United States v. Weinstein,

828 F. Supp. at 5 (quoting Johnson, 971 F.2d at 568). The Money

Laundering Control Act, however, "prohibits a much broader range

-14-

of conduct than just the 'classic' example of money laundering."

Johnson, 971 F.2d at 569. The language of the statute, in

conjunction with the definitions provided in 18 U.S.C. 1956(c),

indicates that Congress intended to criminalize a broad array of

transactions designed to facilitate numerous federal crimes,

including illegal gambling. See generally Stavroulakis, 952 F.2d

at 691 ("Section 1956 creates the crime of money laundering, and

it takes dead aim at the attempt to launder dirty money . . . .

Congress has made clear that concealing the source of illegal

gambling proceeds is just as detrimental to society as concealing

the source of narcotics money."); United States v. Skinner, 946

F.2d 176, 177 (2d Cir. 1991).5

There is little question that the conduct to which

LeBlanc and Weinstein pled guilty not only comes within the plain

language of 18 U.S.C. 1956, but also was within the full

contemplation of Congress when it enacted that statute.

Weinstein asked gamblers to structure their checks in amounts

less than $10,000; he asked that the gamblers make the checks

payable to fictitious payees; he received the checks; and he then

negotiated the checks. LeBlanc received and negotiated checks

obtained from illegal gambling activities, which had been made

payable to fictitious payees.

The district court suggests that all LeBlanc and

Weinstein are really guilty of is gambling, and that the money

5 The language of U.S.S.G. 2S1.1 and the associated policy
statements are not inconsistent with this interpretation of the
scope of the crime of money laundering.

-15-

laundering statutes were improperly used as an alternative method

to punish this underlying offense. As a preliminary matter, if

the court did not believe that LeBlanc and Weinstein were guilty

of money laundering, the court should have refused to accept

their guilty pleas to those offenses for lack of a factual basis.

Moreover, LeBlanc and Weinstein did more than conduct illegal

gambling businesses. Both took specific and concrete actions to

launder the proceeds from these gambling activities. The

critical financial transactions occurred after the gamblers had

placed and lost their wagers with LeBlanc and Weinstein, when

they then negotiated the checks. The court's recharacterization

of the actual conduct of LeBlanc and Weinstein ignores the fact

that they both pled guilty to, and were guilty of, money

laundering, a distinct, successor offense. See, e.g., United

States v. Morris, 18 F.3d 562, 569 (8th Cir. 1994).

Put simply, the court failed to recognize that

defendants had committed two offenses; gambling, followed by

money laundering. Its statement that it was "difficult . . . to

conceive of gambling being conducted or transacted in any form

other than by money or monetary instruments," and that sentencing

for money laundering "would present an inequity," misses the

point. There was no inequity. Leblanc and Weinstein did not

have to act in a manner that patently violated 18 U.S.C. 1956.

The court erred by construing the scope of the money

laundering statute, and the heartland of its commensurate

sentencing guideline too narrowly. The conduct of LeBlanc and

-16-

Weinstein did, in fact, fall within the "heartland" of a money

laundering case, and therefore their conduct was not of a "kind"

that properly justified a downward departure. We find that the

court erred by departing downward, and that LeBlanc and Weinstein

should have been sentenced pursuant to the strictures of the

money laundering guideline.

-17-

II. LEBLANC'S APPEAL

A. BACKGROUND

At sentencing, LeBlanc moved for a downward departure

from the Sentencing Guidelines based upon his physical condition.

LeBlanc suffered his first heart attack in 1981 at the age of 34.

After pleading guilty in the instant case, while awaiting

sentencing, LeBlanc suffered a second heart attack on March 18,

1993.

Prior to the first disposition hearing, LeBlanc

submitted a medical report to the court from his own physician,

Dr. Solomon A. Gabbay. The report stated that "Mr. LeBlanc has a

[known] history of coronary artery disease" and that "Mr. LeBlanc

will probably require long term therapy for his cardiac history."

Dr. Gabbay concluded: "[a]t this point in time I would expect

[LeBlanc] to require medicine for the rest of his life."

The initial disposition hearing was held on May 20,

1993. The court then continued the hearing and ordered that an

independent cardiologist examine LeBlanc, at Government expense,

and report the medical findings to the court to determine the

extent and seriousness of LeBlanc's cardiac problems.

A second disposition hearing was held on June 25, 1993.

Pursuant to the court's previous order, LeBlanc had been examined

by Dr. Guy L. Reed on June 10, 1993. Dr. Reed issued a report in

which he stated that LeBlanc had coronary artery disease. He

concluded that LeBlanc's "heart disease is likely to be largely

controlled with medication but he is also at risk for recurrent

-18-

myocardial infarction. Because of his coronary artery disease

and hypercholesterolemia, he will continue to need ongoing

medical care indefinitely with check-ups at 4-6 month intervals."

After reviewing Dr. Reed's report, the court refused to

grant LeBlanc a downward departure based on health reasons. The

court stated:

I don't read this report as being one
that would even permit me, let alone
persuade me, to go beyond the guidelines.

Now, I would put it in those terms;
because, if I am wrong, then you can
appeal that. In other words, I determine
that this report, which we will mark as a
Court Exhibit, does not permit me, or
there is nothing here that would permit
me to go below the guidelines. If I am
wrong as a matter of law, you can appeal
it, and you can come back and we will re-
sentence him.

B. THE DEPARTURE DECISION

As a general rule, a district court's refusal to grant

a downward departure is not appealable. United States v.

Lombardi, 5 F.3d 568, 571 (1st Cir. 1993); United States v.

Hilton, 946 F.2d 955, 957 (1st Cir. 1991); United States v.

Romolo, 937 F.2d 20, 22 (1st Cir. 1991). Appellate jurisdiction

does attach, however, where the sentencing court's decision "not

to depart is based on the court's mistaken view that it lacks the

legal authority to consider a departure." Hilton, 946 F.2d at

957 (quoting Romolo, 937 F.2d at 22). Thus, in order to have

jurisdiction, we must conclude that the district court

misunderstood its authority to depart under the guidelines.

United States v. DiIorio, 948 F.2d 1, 8 (1st Cir. 1991). If we

-19-

find that the court understood its power to depart, but refused

to exercise that power, we lack jurisdiction to consider the

appeal. Id. In fact, the district court acknowledged our

ability to review its decision when the court stated that it

lacked the legal authority to depart based upon the circumstances

presented to it, and that LeBlanc could appeal this determination

if the court was wrong as a matter of law.

We believe that based upon the record, the district

court fully understood its ability to depart under the

guidelines, but found that it was unable to do so under the facts

of this case. LeBlanc contends that the district court

erroneously concluded that it was "forbidden" by the guidelines

to consider his heart condition as a basis for departure. We do

not agree. At the first disposition hearing, LeBlanc moved for a

downward departure based on his heart condition and presented

supporting evidence from his physician, Dr. Gabbay. The court

then continued the hearing and ordered the parties to have a

court appointed physician examine LeBlanc to determine the

severity of his heart condition. If the court had believed that

a downward departure was forbidden, it would not have required

the parties to engage in the useless exercise of obtaining an

independent physician's opinion. Thus, the court considered the

possibility that LeBlanc's heart condition warranted a downward

departure, but after reviewing the facts, found that his

condition was not serious enough to justify such a departure.

The court correctly understood that a departure for

-20-

medical reasons was "discouraged" by the guidelines. Departures

based upon health problems are "discouraged" and can only be

justified if the medical problems are "present in unusual kind or

degree". Rivera, 994 F.2d at 948. U.S.S.G. 5H1.4 states in

pertinent part:

Physical condition or appearance,
including physique, is not ordinarily
relevant in determining whether a
sentence should be outside the applicable
guideline range. However, an
extraordinary physical impairment may be
a reason to impose a sentence below the
applicable guideline range . . . .

Based upon the facts presented to it at sentencing, the

district court did not believe that LeBlanc's heart condition

presented an extraordinary physical impairment within the meaning

of U.S.S.G. 5H1.4 that would permit the court to depart, much

less persuade it to do so, under the Guidelines. LeBlanc suffers

from a heart condition. Both Dr. Gabbay and Dr. Reed stated,

however, that LeBlanc's heart condition could be treated with

medicine. There was no indication in either physicians' medical

report that LeBlanc's life would be threatened or shortened by

virtue of being incarcerated. Additionally, there was no

evidence that the Bureau of Prisons would be unable to adequately

accommodate LeBlanc's medical needs.

There was nothing in the record which indicated that

the sentencing court was mistaken about its power to depart

downward. Rather, the court fully understood its departure

ability, but concluded that U.S.S.G. 5H1.4 simply did not

permit departure under the circumstances. This was a judgment

-21-

call which was supported by the record. As such, the court's

departure decision is not reviewable on appeal. See, e.g.,

DiIorio, 948 F.2d at 9.

For the foregoing reasons, with respect to the

Government's appeals, we vacate the sentences of LeBlanc and

Weinstein, and remand the case to the district court for

resentencing. With respect to LeBlanc's cross-appeal, the appeal

is dismissed for want of appellate jurisdiction.

-22-