**UNITED STATES, Appellee,**

v.

**Darryl WOOD, Defendant, Appellant.**

**No. 90–1599.**

United States Court of Appeals,
First Circuit.

Heard Dec. 3, 1990.

Decided Feb. 1, 1991.

William Maselli, Andover, Me., for defendant, appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and James L. McCarthy, Asst. U.S. Atty., Portland, Me., were on brief, for appellee.

Before BREYER, Chief Judge, and ALDRICH and COFFIN, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Defendant Darryl Wyatt Wood was charged in a two-count indictment with conspiracy to distribute and to possess with intent to distribute cocaine and with aiding

and abetting possession with intent to distribute cocaine. *See* 21 U.S.C. §§ 846, 841(a)(1). He was found guilty on the conspiracy count but acquitted on the aiding and abetting count. He asserts on appeal two reasons why his conviction should be reversed: the court's admission into evidence of a letter he wrote to his wife violated the privilege for confidential marital communications, and the court improperly admitted evidence of prior bad acts. He alternatively argues that his sentence should be reduced because the court wrongly considered unrelated uncharged conduct in calculating his offense level under the Sentencing Guidelines. We affirm the conviction, but remand for resentencing.

We shall not present a lengthy recitation of facts at the outset of our opinion, but instead shall discuss those facts relevant to defendant's individual arguments as necessary for our analyses of those claims. Indeed, with respect to plaintiffs' two arguments for reversal, we see no need to do more than respond briefly to defendant's claims and therefore choose to provide only the barest of factual background.

### I. *Prior Bad Acts*

■ Defendant claims that the court erred by allowing into evidence testimony concerning drug transactions in which he allegedly participated some months before the charged incident. This argument is without merit. Wood's defense rested substantially on the claim that he was uninvolved with his wife's drug dealing business, and that he simply made personal use of cocaine. Evidence showing a pattern of involvement in previous drug distribution activity was admissible under Fed.R.Evid. 404(b) as evidence of his knowing participation in the charged scheme. *See, e.g., United States v. Latorre*, 922 F.2d 1, 8 (1st Cir.1990); *United States v. Ferrer–Cruz*, 899 F.2d 135, 137–39 (1st Cir.1990) (citing First Circuit cases). *See also Latorre*, 922 F.2d at 8–9 (quoting *United States v. Scelzo*, 810 F.2d 2, 4 (1st Cir.1987) ("in a conspiracy prosecution, 'evidence of similar past crimes or wrongful acts may be especially appropriate' because in a conspiracy case 'knowing participation and intent is an issue of crucial import' ")).

■ Pursuant to Fed.R.Evid. 403, the district court determined that the probative value of this evidence outweighed the danger of unfair prejudice. We review that determination only for abuse of discretion. *See Ferrer–Cruz*, 899 F.2d at 138; *United States v. Dworken*, 855 F.2d 12, 28 (1st Cir.1988). We find no abuse. The court carefully performed the requisite balance, *see* Tr. II–85–86, and its conclusions are unassailable. Moreover, the court gave lengthy limiting instructions to the jury both when the evidence was introduced and during the charge at the conclusion of the trial. Defendant is not entitled to a new trial on this basis.

### II. *Marital Communications Privilege*

■ Defendant argues that the court should not have allowed into evidence a letter he wrote to his wife, Sharon Thamert Wood, when both were in jail after their arrests for the crimes at issue in this case. Of particular concern to Wood is his statement in the letter that "you didn't get into this alone." Thamert, who entered into a plea bargain with the government and was its main witness against her husband, turned the letter over to the prosecution on the first day of Wood's trial. In an effort to prevent Thamert from testifying about the letter, Wood invoked the common law marital communications privilege, which protects the confidentiality of private communications made between spouses during their marriage. *See United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir.1986). The district court allowed the testimony on the ground that the privilege could be waived by one of the spouses.

We doubt that, as the law now stands, the letter was admitted properly. Caselaw makes it clear that one spouse can waive the privilege to refuse to appear as a witness against the other spouse, *see Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). But the government cites no case holding that the privilege barring disclosure of confidential communications between spouses may

be waived over the objection of the non-testifying spouse. Recent cases assume the continuing vitality of the communications privilege. *See Picciandra*, 788 F.2d at 43; *United States v. Ammar*, 714 F.2d 238, 258 (3rd Cir.1983). In addition, we question the government's theory that the letter fell outside the marital privilege because it "pertained to ongoing or future criminal activity involving both spouses," *Ammar*, 714 F.2d at 257. The letter was written after both spouses' arrests and, consequently, after the conclusion of the alleged conspiracy between them.[1]

In any event, we need not dwell on the applicability of the privilege because we conclude that even if the letter was admitted improperly it amounted to no more than harmless error. Where, as here, the asserted error is not of constitutional magnitude, reversal is required only if the miscue "'affect[ed] substantial rights,'" *United States v. Ladd*, 885 F.2d 954, 957 (1st Cir. 1989) (quoting Fed.R.Crim.P. 52(a)).

> Put another way, a new trial is unnecessary if it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). As we have recently observed, "the *Kotteakos* 'fair assurance' standard is satisfied if it is 'highly probable' that the challenged action did not affect the judgment." *United States v. Hernandez–Bermudez*, 857 F.2d 50, 53 (1st Cir.1988) (citations omitted).

*Id.*

We are confident that the challenged letter did not have a substantial impact on the trial. The critical statement—"you didn't get into this alone"—is by no means a direct and dramatic "caught-with-the-goods" kind of admission and, indeed, could be interpreted to refer to the participation of Thamert's cocaine sources or her distributor rather than to Wood. The letter was introduced on cross-examination in a low-key fashion such that it was not likely to elicit particular attention from the jurors.

Moreover, the objective evidence implicating Wood in the charged conspiracy, which transpired between April 13 and 15, 1988, was solid. Phone records documented that a series of calls were made from Wood's motel in Virginia during the night of April 13th. Two of these calls were made to Thamert and two were made to a drug supplier named Alonzo. Wood and Thamert met the next day in New York, where Thamert obtained the drugs that were seized in Maine the following day. Whether or not Wood directly procured the cocaine—as Thamert testified and Wood denies—the timing of the phone calls and the New York trip is strong evidence of Wood's involvement in the conspiracy to obtain drugs for Thamert to distribute. The jury, moreover, properly was entitled to consider Wood's participation in previous drug transactions in deciding whether he played a role in the April conspiracy.

In light of the other evidence and the ambiguous content of the challenged letter, together with its understated presentation to the jury, we believe it highly probable that the letter had no effect on the judgment. We therefore conclude that if the court erred in admitting the letter, such error was harmless.

---

**1.** The government relies on language from *Ammar* to assert that Wood's statements were admissible even though they occurred after the arrests. In *Ammar*, the court held that "[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible...." 714 F.2d at 252. In *Ammar*, however, the reassuring statements were made *during* the conspiracy. In a separate discussion, the court concluded that statements made between a married couple after only the husband's arrest were admissible because those statements referred to collecting money owed as a result of the heroin transactions in which the couple had engaged. *Id.* at 253. Because "[t]he distribution of the proceeds of a conspiracy is one of its central objectives, ... statements which are directed to that purpose must be considered to be in furtherance of the conspiracy." *Id.* Thus, *Ammar* does not support the government's proposition that statements designed to maintain cohesiveness made *after* the conclusion of a conspiracy are in furtherance of the conspiracy rather than "'mere narratives' of past events," *id.* at 252.

III. *Relevant Conduct for Sentencing*

The Sentencing Guidelines operate in most narcotics cases so that a defendant's base offense level—the foundation for the sentence—is determined not by the amount of drugs involved in the charged transaction but by the total amount of drugs involved in all transactions "that were part of the same course of conduct or common scheme or plan as the offense of conviction," whether or not charged in the indictment. U.S.S.G. § 1B1.3(a)(2). *See United States v. Sklar,* 920 F.2d 107, 110 (1st Cir.1990); *United States v. Blanco,* 888 F.2d 907, 908–11 (1st Cir.1989).

In this case, the conspiracy for which Wood was convicted involved 3.2 ounces of cocaine. The district court found that the relevant amount for sentencing, however, was 15.4 ounces based on Wood's participation in four other transactions that formed part of a common scheme extending from November 1987 to April 1988. The court specifically adopted the facts concerning the four additional transactions as set forth in Wood's presentence investigation report (PSI), and it stated that its findings were based on the evidence adduced at trial. The 15.4 ounces resulted in a base offense level of 24, which for Wood's criminal history category produced a sentencing range of 63 to 78 months. Wood received a 78–month sentence.

Wood argues that the district court erred in concluding that the four other transactions described in the PSI were part of the same common scheme as the charged transaction. He claims that each was a distinct "course of conduct" because significant differences existed from transaction to transaction: the sources varied, his involvement varied and the methods for transporting the cocaine from New York to Maine varied. Moreover, he claims that his participation in the other transactions was not established by a preponderance of the evidence. *See Sklar,* 920 F.2d at 110 (government must prove link between other conduct and charged offense by preponderance of the evidence). Thus, he contends that only the drugs seized in April 1988 should be considered, and that his

proper offense level is 16, with a sentencing range of 27 to 33 months.

On appeal, the sentencing court's finding that drugs other than those specified in the indictment were part of the same common scheme or course of conduct is entitled to considerable deference. *See id.; United States v. Bradley,* 917 F.2d 601, 605 (1st Cir.1990). Absent mistake of law, we review such conclusions only for clear error. *Sklar,* 920 F.2d at 110; *Bradley,* 917 F.2d at 605. Before applying this standard to the case before us, we think it worth reiterating briefly why the Guidelines aggregate charged and uncharged quantities of drugs for sentencing purposes.

In *Blanco,* 888 F.2d at 909–910, we noted that Guidelines § 1B1.3(a)(2) reflected a compromise among considerations that favor a "real offense" sentencing system—basing time served on all of a defendant's related criminal activity—and a "charge offense" system—basing time served on the precise activity for which the defendant was convicted. For the most part, the Guidelines set up a "charge offense" system and require calculation of the offense level based only on the charges of which the defendant has been convicted. *Id.* at 910. If the defendant has committed criminal acts that do not lead to convictions, these may be taken into account at a later step in the process, when the judge chooses a specific sentence within the appropriate range. *See United States v. White,* 888 F.2d 490, 496 (7th Cir.1989); U.S.S.G. § 1B1.4.

Section 1B1.3(a)(2) is the important exception to this charge-offense approach. It was designed for certain kinds of "fungible item" crimes, *Blanco,* 888 F.2d at 911, including those involving drugs, because of the way courts previously had sentenced for such crimes and because it is often difficult to break such crimes into "discrete, identifiable units that are meaningful for purposes of sentencing," *White,* 888 F.2d at 497 (quoting Guidelines Manual 1.19 (Jan. 1988)); *Blanco,* 888 F.2d at 911.

But § 1B1.3(a)(2) is not open-ended in allowing a sentencing court to take into

account criminal activity other than the charged offense.

> Sentence must be based on the [crimes] that were part of one "common scheme or plan" (such as a single conspiracy) or a single "course of conduct" (the unilateral equivalent to the conspiracy). Offenses of the same kind, but *not* encompassed in the same course of conduct or plan, are excluded.

*White,* 888 F.2d at 500 (emphasis in original). *See also Sklar,* 920 F.2d at 111 ("Not every drug transaction undertaken by every drug trafficker is necessarily linked in a meaningful sense.") The goal of the provision, we think, is for the sentence to reflect accurately the seriousness of the crime charged, but not to impose a penalty for the charged crime based on unrelated criminal activity.

■ In light of this background, we think the district court properly could find that three of the four uncharged transactions on which it based Wood's offense level were part of the same common scheme as the charged conspiracy. In each of the three dealings that the PSI described as occurring in December 1987, Wood personally obtained the cocaine from a source in New York and delivered it to Thamert for distribution in Maine—the same pattern of conduct that formed the basis for the charged conspiracy. These similarities are sufficient to permit the court's finding of a common scheme, despite some differences in detail among the transactions. We therefore conclude that the court did not clearly err by aggregating the 6.5 ounces of cocaine involved in these three transactions with the 3.2 ounces seized in April 1988. *See United States v. Gooden,* 892 F.2d 725, 729 (8th Cir.1989) ("The cocaine sales ... were drug transactions of a similar character, conducted in the same geographical area within a few months of the offenses of conviction ... demonstrat[ing] a pattern of continuous drug activity.")

■ Our conclusion is different, however, with respect to the fourth transaction, which occurred on January 11, 1988. The government acknowledges that the deal on that day was consummated solely by Wood's wife and that Wood did not even know about it until it was over. The PSI nevertheless concluded that the January purchase was part of the same scheme as the offense of conviction because during that transaction Thamert paid off part of Wood's previous debt to the drug supplier, thereby benefiting Wood.

The government, however, has offered no precedent for such a broad interpretation of § 1B1.3(a)(2), and we think a fair reading of the provision in light of its background simply does not permit it. In all of the cases cited by the government, a defendant was held responsible under § 1B1.3(a)(2) for other conduct *of his or her own* that either was an uncharged part of the crime of conviction, or a repetition of the crime. *See, e.g., Bradley,* 917 F.2d at 604–605; *United States v. Woolford,* 896 F.2d 99, 104 (5th Cir.1990); *United States v. Mocciola,* 891 F.2d 13, 15 (1st Cir.1989); *United States v. Fox,* 889 F.2d 357, 360–61 (1st Cir.1989); *Gooden,* 892 F.2d at 728–29. *See also Sklar,* 920 F.2d at 111.

Wood's only connection with the January 11th transaction was as a beneficiary of someone else's criminal activity, a link that had nothing to do with *his* conduct. To significantly increase Wood's sentence based on a transaction in which he took no part strikes us as such a substantial step away from "charge offense" sentencing that it could not have been contemplated as within the § 1B1.3(a)(2) exception.[2] *See Sklar,* 920 F.2d at 111 ("[C]ourts must be careful to hold the adjudicative balance steady and true, giving U.S.S.G. § 1B1.3(a)(2) the scope which its letter com-

---

**2.** The government has not argued that Wood may be held accountable for Thamert's January purchase simply by virtue of his participation in a longstanding scheme with her, undoubtedly because the Guidelines do not provide for such vicarious liability. Subsection (1) of § 1B1.3(a) allows a defendant's base offense level to reflect the acts of others "in furtherance of the execution of the jointly-undertaken criminal activity," *see* § 1B1.3 Commentary, Application Note 1, but this co-conspirator-like liability is limited to acts occurring "during the commission of *the offense of conviction,*" § 1B1.3(a)(1) (emphasis added).

mands while at the same time resisting prosecutorial efforts aimed at enlarging it.")

Even if Wood's accepting a benefit from the transaction in some way could be deemed culpable conduct, that conduct was distinctly different from the crime of conviction. Wood was found guilty of conspiring to deal drugs. On January 11th, he neither conspired nor even knew about the drug deal. His after-the-fact connection to the January transaction would reveal nothing about his culpability as a drug conspirator, and therefore would not be relevant in determining his offense level for the charged crime.

Our conclusion is reinforced by the fact that excluding this information from the determination of Wood's offense level does not mean that it may never be factored into his sentence. Section 1B1.4 provides that a court deciding upon what sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." Thus, as the background commentary to § 1B1.3 notes, "[t]he range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined." In other words, the district court could have considered Wood's beneficiary status in the January transaction as relevant in choosing the appropriate sentence within the proper guideline range. It erred, however, in using the six ounces for the purpose of calculating his base offense level.

The government has offered two theories for why such an error was harmless. First, it notes Wood's testimony acknowledging personal use of two to three pounds of cocaine during the months before his arrest, and argues that this amount places him at an offense level higher than 24. The district court, however, made no finding that Wood's personal drug use was part of the same "common scheme" or "course of conduct" as his April conspiracy activity and, moreover, we fail to see any basis on which it could have done so. As should be obvious from our discussion above, the fact that both activities involved drugs is simply not enough.

Alternatively, the government points to a series of Western Union transfers to Wood from Thamert totalling $16,825 between September 1987 and April 1988. Noting that Wood never disputed Thamert's testimony that this money either was intended for him to purchase drugs or was the proceeds of Thamert's drug trafficking, the government divides the total by $750—the prevailing rate for an ounce of cocaine—to conclude that Wood benefited from the sale of roughly 628 grams of cocaine. This approach, however, like the personal use alternative, impermissibly seeks to widen the scope of Wood's conspiracy liability with conduct of a distinctly different nature. We therefore conclude that the six-ounce error was not harmless and that Wood must be resentenced.[3]

*Accordingly, the judgment of conviction is affirmed, but the sentence is vacated and the case is remanded for resentencing consistent with the principles expressed in this opinion.*

---

**3.** We implicitly already have rejected Wood's complaint that the district court considered unreliable information in determining the applicable amount of cocaine, and we now so hold explicitly. The source for the information contained in the PSI about the other drug transactions was Thamert, and she also was the principal witness at the trial over which the sentencing judge presided. We have no basis for second-guessing his judgment that she was credible.