UNITED STATES, Appellee,

v.

Joseph BEY, Jr., Defendant, Appellant.

No. 98–1388.

United States Court of Appeals,
First Circuit.

Argued May 7, 1999.

Decided Aug. 12, 1999.

Dana A. Curhan, by appointment of the Court, for appellant.

Emily R. Schulman, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney was on brief, for appellee.

Before Stahl, Circuit Judge, Kravitch,* Senior Circuit Judge, and Lipez, Circuit Judge.

KRAVITCH, Senior Circuit Judge.

In this appeal we address the joint-participant exception to the marital communications privilege, the propriety of a prosecutor's remarks to the jury during closing argument, and the requirements necessary to support a sentencing enhancement for the defendant's role as a supervisor of criminal activity. Discerning no reversible error, we affirm the defendant-appellant's convictions and sentence for importing cocaine into the United States.

## BACKGROUND

Joseph Bey, Jr. stood trial on six counts of importing cocaine into the United States, in violation of 21 U.S.C. § 952(a), one count of conspiring to import cocaine, in violation of 21 U.S.C. § 963, and one count of attempting to import cocaine, also in violation of 21 U.S.C. § 963. At trial, the government presented evidence that showed Bey recruited a number of unsuspecting couriers to transport large amounts of cocaine, diluted in bottles of alcohol, from Jamaica to the United States. Bey would recruit one or two persons at a time to assist him in filming various documentary films in Jamaica. Although the recruits typically had no experience in this type of work, Bey convinced them that the work was easy, that he would train them, and that he would pay for all their expenses on the trip. Once in Jamaica, the recruits would take part in minimal filming with equipment that frequently did not work and spend the remainder of their

* Of the Eleventh Circuit, sitting by designation.

time on vacation. When the recruits returned to the United States, Bey or someone else would give each recruit three bottles and ask them to take the bottles to John Moore or Vasco Harriott in the United States. Under the impression that the bottles contained only rum or wine for Bey's friends at home, the recruits would agree and bring the bottles into the United States. In fact, the bottles contained a solution of alcohol and cocaine.

Bey's defense at trial was that he was unaware of the real contents of the bottles and that he believed Moore legitimately was interested in the documentary work for which Moore had hired him. Moore testified for the government in return for promises of leniency; his credibility, therefore, was an issue at trial. The government also presented the testimony of Bey's wife, Catherine Bey, over Bey's objection. Catherine Bey testified that Bey was a knowing participant in the scheme to import cocaine.

## DISCUSSION

On appeal, Bey, through counsel, argues that the government violated the marital communications privilege by forcing Bey's wife, Catherine Bey, to testify regarding confidential marital communications. He also argues that the prosecutor made a number of errors during the government's closing argument that require us to reverse his convictions. Additionally, Bey filed a supplemental *pro se* brief in which he added to his counsel's arguments [1] and raised several additional challenges to his convictions and sentence, only one of which—regarding the district court's calculation of his sentence—merits extended discussion.[2]

## I. Marital Communications Privilege

The marital communications privilege permits a federal criminal defendant to bar his or her spouse from testifying regarding confidential communications that took place during the marriage. *See United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir.1986). "Communications concerning crimes in which the spouses are jointly participating, however, do not fall within the protection of the marital communications privilege." *Id.* The district

1. Bey, both through counsel and *pro se*, presented a so-called *Singleton* claim, arguing that the district court should have excluded the testimony of government witnesses, particularly John Moore, who testified for the government in exchange for promises of lenience. *See generally United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), *rev'd*, 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied*, ─ U.S. ─, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). As we definitively rejected the *Singleton* argument in *United States v. Lara*, 181 F.3d 183 (1st Cir.1999), we need not revisit the issue in today's opinion.

2. Bey adds three arguments attacking his conviction: (1) that the government failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) that the government improperly impeached a defense witness; and (3) that he received ineffective assistance of counsel at trial in derogation of his Sixth Amendment rights. First, we conclude that Bey failed to demonstrate either that the government withheld any materials in this case or that the materials that form the basis of Bey's allegations would have been exculpatory. *See United States v. Wilson*, 798 F.2d 509, 514 (1st Cir.1986) (noting that the defendant bears the burden of proving that the *Brady* violation occurred); *United States v. Drougas*, 748 F.2d 8, 23 (1st Cir.1984) (listing the elements of a *Brady* violation). Second, upon review of the record, we find that the district court did not abuse its discretion when it permitted the government to challenge a defense witness's credibility regarding the stated reason for his detention. *See United States v. Perez–Perez*, 72 F.3d 224, 227 (1st Cir.1995) ("Impeachment by *contradiction* is a recognized mode of impeachment...."). Finally, our cases explain that we typically will not review a claim for ineffective assistance of counsel on direct appeal when the trial court did not have an opportunity to address the issue. *See United States v. Mala*, 7 F.3d 1058, 1063 (1st Cir.1993) (claims for ineffective assistance "cannot make their debut on direct review of criminal convictions, but rather, must originally be presented to and acted upon by the trial court."); *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991).

court in this case found that Catherine Bey became a joint participant in the conspiracy to import cocaine and that her testimony, therefore, fell outside the privilege.

■ We review a claim that the district court erroneously admitted testimony at trial in derogation of an evidentiary privilege for an abuse of discretion. *See United States v. Reeder*, 170 F.3d 93, 106 (1st Cir.1999) (attorney client privilege), *pet. for cert. filed* (July 9, 1999); *United States v. Short*, 4 F.3d 475, 479 (7th Cir. 1993) (marital communications privilege). More particularly, in assessing whether the district court properly admitted a spouse's testimony pursuant to the joint-participant exception to the marital communications privilege, the court's evaluation of a testifying spouse's complicity in the underlying crime is a question of fact that we review for clear error. *See Picciandra*, 788 F.2d at 43.

■ The government must produce evidence of a spouse's complicity in the underlying, on-going criminal activity before the district court may admit testimony regarding confidential communications between the defendant and the spouse. The spouse's involvement in the criminal activity, however, need not be particularly substantial to obviate the privilege. *See, e.g., Short*, 4 F.3d at 479 (noting that the spouse's "minor role" in aiding and abetting the defendant's conspiracy was sufficient to admit testimony regarding marital communications). In *Picciandra*, for example, we held that a spouse who had participated in discussions regarding the defendant's money laundering scheme and had delivered cash to one of the conspirators, was herself a co-conspirator and therefore a joint participant. 788 F.2d at

43. Similarly, in *United States v. Hill*, 967 F.2d 902, 912 (3d Cir.1992), the court concluded that a spouse who had accepted drug deliveries, informed the defendant of the deliveries, and counted drug proceeds, was a joint participant in the defendant's drug crimes and therefore could testify against the defendant at trial.

During *voir dire* in the case at bar, Catherine Bey testified that she engaged in a number of acts similar to those described above and thus implicated herself as a joint participant in Bey's conspiracy to import cocaine.[3] Catherine Bey testified that she knew the purpose of Bey's trips to Jamaica before he traveled there the first time. With that knowledge and despite her testimony that she sought to discourage Bey from engaging in criminal acts, Catherine Bey drove Bey to the bus stop so that he could travel to Jamaica, wired Bey money for his personal use while he was abroad, and knowingly accepted drug proceeds upon Bey's return from each trip. Catherine Bey also testified that she knew John Moore was part of the drug conspiracy, that she relayed messages from Moore to her husband, and that she contacted Moore at Bey's request so that Moore could send "expense money" to Bey in Jamaica. She further testified that she maintained Bey's cover story regarding the documentary expeditions in her conversations with various couriers that Bey had recruited. Finally, Catherine Bey testified that she drove Bey to the bus station so that he could travel to Boston to pick up proceeds from his criminal activity. The government contends that each of these acts implicated Catherine Bey as a joint-participant.

3. Our review of the relevant case law revealed no discussion of the quality of evidence required to sustain a finding that the testifying spouse was complicit in the defendant's criminal activity. More particularly, the cases do not refer explicitly to probable cause or whether the evidence against the testifying spouse would support an indictment. We need not decide that issue to resolve this case, however, because Catherine Bey's personal admissions during *voir dire* provide evidence of sufficient factual quality to support her indictment and prosecution *as long as* the acts to which she admitted were of a criminal nature. We, therefore, need only resolve the narrow legal question of whether the acts to which Catherine Bey admitted implicated her in Bey's criminal conspiracy.

We observe no clear error in the district court's decision that Catherine Bey became a joint participant in the criminal activity. In particular, Catherine Bey's knowing acceptance of drug proceeds, her efforts to maintain Bey's cover story for the benefit of his unsuspecting couriers, and her decision to act as a go-between when Bey needed additional funds from Moore to conduct his criminal activity in Jamaica satisfy us that Catherine Bey became a joint participant in the drug conspiracy. *See Short*, 4 F.3d at 478–79 (spouse's preparation of false documents and other aid in concealing the crime sufficient to avoid the privilege); *cf. United States v. Wood*, 924 F.2d 399, 402 n. 1 (1st Cir.1991) (noting that "[t]he distribution of the proceeds of a conspiracy is one of its central objectives") (quoting *United States v. Ammar*, 714 F.2d 238, 253 (3rd Cir. 1983)).

■ We reject, however, the government's contention that the other conduct to which Catherine Bey admitted also constitutes evidence of joint-criminal activity. For example, Catherine Bey's admissions that she provided phone messages to Bey, wired food money to Bey in Jamaica,[4] and drove Bey to the bus station, could be evidence of nothing more than the mundane incidents of their marital relationship. Proof of a criminal conspiracy requires an act "in furtherance of the conspiracy," *see Ammar*, 714 F.2d at 251, which is distinct from an act in furtherance of a working marriage. *See United States v. Rakes*, 136 F.3d 1, 5 (1st Cir.1998) (holding that joint-participation exception requires "wrongful complicity . . . not innocent or involuntary action, to forfeit the privilege.").

■ Finally, Bey argues that the district court should have limited Catherine Bey's testimony regarding her confidential marital communications to only the events in which she was a co-conspirator. Our review of the case law, however, reveals that a court may admit relevant confidential marital communications that take place after the spouse has become a joint participant in the criminal activity. *See Short*, 4 F.3d at 479. In this case, the district court scrupulously sustained Bey's objections to the government's queries into marital communications before Catherine Bey became a participant in the criminal conspiracy. Only after the government demonstrated Catherine Bey's complicity in concrete fashion, did the district court permit her to testify regarding her confidential communications with Bey that took place after she became a participant. Bey's argument, therefore, is unavailing.

## II. The Prosecutor's Closing Argument

■ Bey also challenges the manner in which the trial prosecutor conducted the closing argument on the government's behalf. Bey argues that the prosecutor improperly vouched for the credibility of a government witness and erroneously referred to certain factual matters as undisputed. As Bey failed to object at trial to the comments he now challenges on appeal, however, we review his claims for plain error. *See United States v. Olano*, 507 U.S. 725, 732–37, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993) (describing the plain error standard); *United States v. Wihbey*, 75 F.3d 761, 769–70 & n. 4 (1st Cir.1996). We will not reverse a conviction on plain error review unless the error affects the substantial rights of the defendant. *See* Fed.R.Crim.P. 52(b). We cannot find that an error has affected the defendant's substantial rights unless it is clear that the error affected the outcome of the proceedings. *See Olano*, 507 U.S. at 734, 113 S.Ct. at 1777–78. With these limitations in mind, we address Bey's contentions in turn.

4. On this point, we draw a distinction between Catherine Bey's decision to wire relatively insignificant amounts of her own money to Bey to cover his personal needs and her decision to act as a go-between for Moore and Bey when Bey needed further funds to conduct his criminal activity in Jamaica.

## A. Prosecutorial Vouching

"[A] prosecutor may not place the prestige of the government behind a witness by making personal assurances about the witness'[s] credibility;" nor may the prosecutor indicate that facts outside the jury's cognizance support the testimony of the government's witnesses. *United States v. Neal*, 36 F.3d 1190, 1207 (1st Cir.1994). Bey argues that the prosecutor engaged in improper vouching during rebuttal argument by referring to Moore's plea bargain agreement with the government and the fact that the judge presiding over Bey's trial also would consider Moore's truthfulness when determining Moore's sentence.[5] Bey contends that the challenged statements indirectly suggested that both the prosecutor and the trial judge thought Moore had told the truth during trial. He further asserts that the comments were particularly harmful because they came during the government's rebuttal and were among the last things that the jury heard before it began its deliberations. *See United States v. Auch*, 187 F.3d 125, 131 (1st Cir.1999) (noting the particular sensitivity of this part of the trial) (citing *United States v. Manning*, 23 F.3d 570, 575 (1st Cir.1994)).

We detect no error in the prosecutor's argument to the jury. In *United States v. Dockray*, 943 F.2d 152 (1st Cir.1991), we explained that a prosecutor properly may admit a witness's plea agreement into evidence, discuss the details of the plea during closing arguments, and comment upon a witness's incentive to testify truthfully. *Id.* at 156 (citing authority). The trial transcript reveals that the government's rebuttal argument came in response to Bey's lawyer's argument that the jury should disbelieve Moore's testimony because he had an incentive to curry favor with the government. The argument of Bey's counsel was neither inflammatory nor improper, and the prosecutor's measured response to that argument also fell entirely within the accepted bounds. Rather than transgressing terrain forbidden under our case law by arguing or implying that Moore had told the truth, *see Auch*, 187 F.3d at 129–31 (surveying such errors and the case law), the prosecutor's rebuttal reminded the jury that it should examine the testimony of an interested witness like Moore carefully but explained that Moore's fate under the plea agreement depended upon the veracity of his testimony. The prosecutor's review of the plea agreement and Moore's fate was accurate and, significantly, the prosecutor urged the jury to consider that evidence as part of their deliberations; he did not urge a personal conclusion or evaluation of Moore's credibility on the jury.

Bey, however, argues that the prosecutor's arguments insinuated a less innocent message to the jury. He contends that the comments indirectly suggested that the trial judge who presided over the trial already had concluded that Moore was credible. Although we are mindful that the cold transcript necessarily limits our ability to catch the potential nuances of the prosecutor's remarks, Bey's argument strains the prosecutor's words too much. The prosecutor accurately told the jury that the trial judge, at some time in the future, would assess whether Moore had offered credible testimony but suggested nothing about what the trial judge already might have concluded. Moreover, even if we discerned any ambiguity in the prosecutor's comments, we would be loath to attribute to the remarks the remote impli-

---

5. In relevant part, the prosecutor said:

   Now, the other thing about Moore I want to mention is his plea agreement. That's in evidence. And if you have questions about that whole business, look at it carefully, paragraphs 5 and 6. He's required to tell the truth. That is a part of the agreement and you can't ignore that. You can't sepa- rate that out. And who's going to make the determination about John Moore? Judge Keeton, the judge who sat here and listened to Moore's testimony and listened to that testimony in relation to the other witnesses. He's going to make a determination, Judge Keeton.

**8**

cations that Bey urges upon us. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury ... will draw that meaning from the plethora of less damaging interpretations."); *United States v. Taylor*, 54 F.3d 967, 979 (1st Cir.1995) ("We are especially reluctant to fish in the pool of ambiguity when, as now, the complaining party failed to bring a dubious comment, easily corrected on proper notice, to the immediate attention of the trial court.") (internal quotations omitted). Accordingly, we hold that the prosecutor's remarks did not constitute error and certainly did not rise to the level of plain error.

### B.  References to Evidence as Undisputed

Bey also finds fault with the prosecutor's references to various matters as undisputed or beyond question, during closing argument. First, he argues that the prosecutor's statements were inaccurate and may have misled the jury. Second, Bey contends that the remarks constituted improper commentary on his decision not to testify and encouraged the jury to draw an adverse inference from that decision. We reject both contentions.

■  The prosecutor's closing argument attempted to narrow the issues for the jury's consideration to the primary disputed question of whether Bey was aware of the cocaine importation scheme or genuinely believed he was in Jamaica to work on a filming project. To that end, the prosecutor told the jury that there was "no real question" that Bey had traveled to Jamaica four times in 1995, that Bey had not paid for his travel or accommodations on those trips, that Bey had recruited oth-

ers to accompany him or meet him in Jamaica, that Bey told these recruits they would be helping him film a documentary, that the recruits had little or no filming experience, that the recruits did little or no work while in Jamaica, that each recruit received bottles to transport back to the United States, and that the bottles contained liquid cocaine. Bey argues that some of these points were very much in dispute and that the prosecutor's comments erroneously may have suggested to the jury that Bey had stipulated those facts.

■  We review a claim that the prosecutor inaccurately stated the evidence to the jury during closing argument to determine "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have affected the outcome of the case." *United States v. Lowe*, 145 F.3d 45, 50 (1st Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 270, 142 L.Ed.2d 222 (1998). Read in context, the prosecutor's comments do nothing more than focus the jury's attention on Bey's knowledge and intent—the very same issue that Bey's counsel addressed during closing argument. Indeed, Bey's counsel made no effort to contest the fundamental series of events at issue; instead Bey's theory of the case was that he was an innocent dupe in the cocaine importation scheme, much like the couriers who brought the bottles of liquid cocaine back to the United States. We see no error in these comments and detect no deliberate attempt to mislead the jury.[6]

Moreover, the district court explicitly cautioned the jury that it could not consider the arguments of counsel as evidence

---

**6.** Bey's counsel concedes that the prosecutor's statements did not appear calculated to mislead the jury. Bey, in his *pro se* brief, retracts that admission and argues that the prosecutor's comments were part of a deliberate and vindictive scheme to prosecute him.

As Bey offers no additional explanation or argument to demonstrate that the prosecutor deliberately attempted to mislead the jury by referring to the essential events as undisputed, however, we cannot agree.

against Bey. In *Lowe* we found such an instruction sufficient to cure any potential prejudice that may have resulted from a prosecutor's unintentional—but far more material—inaccurate restatement of the evidence during closing argument. *See Lowe*, 145 F.3d at 50 (curative instruction limited any potential damage from the prosecutor's erroneous statement that the victim had recounted all the details of the crime to one of the witnesses). We conclude that Bey's argument fails to provide grounds for reversible error.

Bey also argues that the prosecutor's statements that there was no real question about the evidence on these matters constitutes an indirect comment on Bey's decision not to testify at trial. A prosecutor violates the Fifth Amendment by commenting—either directly or indirectly—upon the defendant's failure to testify in his or her own defense. *See United States v. Taylor*, 54 F.3d 967, 978 (1st Cir.1995). We have found such prohibited, indirect commentary in a prosecutor's references to evidence as uncontradicted when the defendant was the only witness who could have provided any contradictory evidence. *See United States v. Flannery*, 451 F.2d 880, 881–82 (1st Cir.1971). The *Flannery* court explained that because such references inevitably would draw the jury's attention to the defendant's failure to rebut the damning evidence by testifying at trial and would invite the jury to make a prohibited adverse inference, the comments violated the defendant's Fifth Amendment rights. *Id.* Bey argues that, by referring to the various details and circumstances of his travels to Jamaica as undisputed, the prosecutor in this case indirectly commented on Bey's decision not to testify and invited the jury to make the prohibited adverse inference.

Again, Bey's argument misses the broader context of the prosecutor's closing remarks and the prosecutor's attempt to focus the jury on the relevant issue. *See United States v. Lilly*, 983 F.2d 300, 307 (1st Cir.1992) (explaining that we review a prosecutor's comments in context, not in isolation, to determine whether the comments implicated the defendant's Fifth Amendment rights); *see also Taylor*, 54 F.3d at 979 (reviewing courts should construe prosecutor's ambiguous remarks in favor of the innocuous meaning, particularly when defense counsel failed to object to the remark at trial). Moreover, to the extent that Bey sought to contradict the matters that the government characterized as beyond question, he would not have had to rely on his own testimony; the details of Bey's travels and the circumstances under which he recruited the various couriers were within the competence of the other witnesses who testified at trial. For example, the couriers testified regarding their recruitment, their lack of filming experience, the work they performed, and their receipt of bottles to bring back to the United States. Accordingly, the prosecutor's argument drew the jury's attention to what the evidence had shown, not to Bey's decision not to testify. Finally, we note that the district court expressly instructed the jury regarding Bey's right not to testify at trial and told the jurors that they could draw no adverse inference from his silence at trial. Under these circumstances, we find no plain error.

## III. Sentencing

Bey's *pro se* brief raises three challenges to the district court's calculation of his sentence. We discern no error in the district court's calculation of the quantity of cocaine attributable to Bey nor in the court's decision to enhance Bey's sentence for obstructing justice. Bey's contention that the district court erred when it enhanced his sentence for his role as a supervisor of the criminal activity, however, merits a brief discussion.

The district court enhanced Bey's offense level pursuant to U.S.S.G. § 3B1.1(b) for his role as a supervisor in

the drug conspiracy.[7] The commentary to section 3B1.1 explains that to qualify for an adjustment as a supervisor, the defendant must have exercised some control over "one or more other participants." U.S.S.G. § 3B1.1, comment. (n.2); *see also United States v. Voccola,* 99 F.3d 37, 44 (1st Cir.1996). The commentary further defines a participant as a person "criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1 comment. (n.1). On appeal Bey argues that the district court abused its discretion by finding that he had supervised any other participant in the criminal enterprise. Bey objected to the section 3B1.1(b) enhancement during the sentencing hearing but on grounds different from those he presents on appeal.[8] Accordingly, we review his argument for plain error. *See United States v. Montas,* 41 F.3d 775, 782–83 (1st Cir.1994) (applying plain error review when the grounds for the defendant's objections varied from the issue raised on appeal).

■■■ Bey argues that because the evidence showed that the people he recruited to travel to Jamaica were unaware of the conspiracy to import cocaine, the couriers were not criminally responsible for bringing cocaine into the United States and therefore do not qualify as participants within the meaning of section 3B1.1. To the extent that Bey supervised mere "dupes," unaware of the criminal activity, Bey's argument is well taken. *Cf. United*

States v. Fuller, 897 F.2d 1217, 1220 & n. 3 (1st Cir.1990) (observing that to qualify as a supervisor, the defendant must have organized other persons and recognizing—but not commenting upon—a Ninth Circuit decision addressing the criminal culpability of the other persons).[9]

■■■ Nevertheless, as we discussed in Part I, *supra,* Catherine Bey became a criminally responsible member of the conspiracy to import cocaine; she, therefore, was a participant in Bey's criminal activity and Bey's supervision of her would support the enhancement. It is of no matter that the government did not prosecute or convict Catherine Bey for her participation. *See* U.S.S.G. § 3B1.1, comment. (n.1). As a result, the district court correctly enhanced Bey's sentence pursuant to section 3B1.1(b).

## CONCLUSION

After reviewing the record in this case and the arguments of both Bey and his counsel, we discern no reversible error. We conclude that the district court did not err when it admitted the testimony of Bey's wife pursuant to the joint-participant exception to the marital communications privilege. We further hold that the prosecutor, during closing argument, did not impermissibly vouch for the credibility of the government's witnesses nor indirectly comment upon Bey's decision to exercise his Fifth Amendment right not to testify in

---

7. Section 3B1.1 provides in relevant part:
    Based on the defendant's role in the offense, increase the offense level as follows:
    (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
    (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
    U.S.S.G. § 3B1.1.

8. Bey has not renewed his argument, made *before the district court,* that the government failed to show that the criminal activity in-

volved five or more participants or was otherwise extensive. In any event, we find the argument to be without merit and will not address it further.

9. *See also United States v. Hall,* 101 F.3d 1174, 1178 (7th Cir.1996) ("a party who gives knowing aid in some part of the criminal enterprise is a 'criminally responsible' participant"); *United States v. Lewis,* 68 F.3d 987, 989–90 (6th Cir.1995) (no enhancement for defendant who recruited unwitting persons to engage in fraud); *United States v. Melendez,* 41 F.3d 797, 800 (2d Cir.1994) (no enhancement for a defendant who supervised innocent parties).

his own defense. Finally, we detect no error in the district court's calculation of Bey's sentence under the Guidelines.

Accordingly, we **AFFIRM**.