# United States Court of Appeals
## For the First Circuit

No. 14-1957

UNITED STATES OF AMERICA,

Appellee,

v.

NICHOLAS MCDONALD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

George F. Gormley, with whom Stephen Super and George F. Gormley, P.C., were on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

October 30, 2015

**LYNCH**, **Circuit Judge**.  Nicholas McDonald was a heroin dealer in the Bangor area of Maine, obtaining his heroin on trips to Worcester, Massachusetts.  Eventually, when caught with 26.4 grams of heroin, he was charged both for the heroin and a gun in his possession.  McDonald pleaded guilty in February 2014 to one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (subject to appealing the denial of his motion to suppress).  The district court quite correctly denied his motion to suppress and, at sentencing, correctly found that he had tried to obstruct justice by trying to swallow a small bag of heroin.

A separate question on appeal has to do with the increase in his base offense level from 18 to 20, which was based not on the drugs he actually possessed but on relevant conduct concerning drugs he purportedly sold.  That relevant conduct was based on untested accounts by a confidential informant (CI) who purportedly had accompanied him on his buying trips south and had been with him on several occasions as he sold drugs.  That is, the Presentence Investigation Report (PSR) contained information from the CI, which came in the form of the CI's grand jury testimony and a statement made to the government.  No law enforcement or other witness saw those sales.  The CI did not testify, and so McDonald never had an opportunity to cross-examine her.

Still, we cannot say there was clear error in the district court's finding that this information met the requirements for relevant conduct and was sufficiently reliable to attribute to McDonald an additional quantity of drugs. There was no clear error in the court's finding that between 40 and 60 grams of heroin were involved, which supported a sentence of 75-months imprisonment on the drug count.

We point out that McDonald received a concurrent sentence of 75-months imprisonment on the firearm charge and will serve 75 months anyway, whatever the merits of the method used by the government to get an increased sentence on the drug charge.

I.

As to the motion to suppress, we recite the relevant facts as found by the district court, consistent with record support. United States v. Arnott, 758 F.3d 40, 41 (1st Cir. 2014). As to the facts relevant to the sentencing appeal, we take the facts as set forth in the unchallenged portions of the PSR and the sentencing hearing. United States v. Innarelli, 524 F.3d 286, 288 (1st Cir. 2008).

On April 5, 2013, Sergeant Roy Peary of the Penobscot County Sheriff's Department received an e-mail about suspicious pawning activity. The e-mail indicated that Kelly Jo Desmond, Jarod Brown, and another unidentified female were trying to pawn construction tools and electronics at a Newport, Maine pawnshop,

- 3 -

but they could not provide a lot of information about the items. The group had an older, dark-colored Pontiac with a license plate beginning with "7450" and ending with undetermined letters.

That same day, Sergeant Peary learned of a burglary in Orrington, Maine. The complainant reported that construction tools had been stolen and said that he suspected his ex-girlfriend, Amy White, was involved. The complainant said that White struggled with drug addiction, knew about his tools, drove a maroon Pontiac Bonneville, and might be staying at a trailer park in Holden, Maine. He said that McDonald and Desmond lived in the trailer where he thought White was staying.

Sergeant Peary learned from the Maine Department of Motor Vehicles that White was the registered owner of a 1999 Pontiac Bonneville with the plate number "7450 TB" that was listed as being purple.[1] He called Holden Police Officer Chris Greeley and told him that he was investigating a burglary and suspicious pawning activity. Greeley knew of existing arrest warrants for McDonald and Desmond. He suspected that McDonald was staying at a trailer park in Holden because he had previously driven McDonald to a trailer there after he picked McDonald up along a roadway in

---

[1] The vehicle identified in the e-mail Peary read was described as dark-colored, older, and having faded and peeling paint on the hood, and the burglary complainant described White's Pontiac Bonneville as maroon. This may explain why the e-mail described the car as "dark colored," while the Maine Department of Motor Vehicles listed it as purple.

February 2013.  Additionally, around that time, the park owner told Greeley that McDonald was living there.

Officer Greeley asked Maine Drug Enforcement Agency Task Force Agent Amy Nickerson to help him with the investigation. Nickerson was familiar with the trailer in question from having conducted surveillance on it.  Nickerson also went to the burglary scene and spoke with the complainant.  The complainant told Nickerson that White had told him that she had been driving McDonald to get drugs in Massachusetts.

Greeley, Nickerson, and Peary met at the Holden Police Department that evening.  Agent Nickerson went to the address of the trailer and saw the Pontiac Bonneville parked there.  Soon after, she saw the Bonneville leaving.  She notified Greeley and Peary of this, and began to follow the car onto Route 1A.  She could see two people in the car and observed that the car was driving at what she estimated was about ten miles per hour below the speed limit.  Greeley, who was waiting at the Holden Police Department's exit onto Route 1A, began to drive behind the Bonneville.  The vehicle was driving slowly, a line of cars had developed behind it, and its brake lights came on three times without any connection to traffic lights or signs.

When Greeley turned on his cruiser's lights to pull the car over, the Bonneville pulled to the side, and its passenger, who was later identified as McDonald, fled into the woods.  Greeley

and Nickerson detained the driver, who turned out to be White, and they saw construction tools in the back seat.  McDonald was tracked down and apprehended.

Officers found a hypodermic needle, a bag of Pentedrone Hydrochloride,[2] a folding knife, $1,430 of cash, pepper spray, and two and a half Suboxone strips containing Pentedrone Hydrochloride on McDonald at the time of his arrest.

A search of the vehicle also revealed a safe.  McDonald denied ownership of the safe, though it turned out to be his.

After being apprehended, McDonald was taken to Eastern Maine Medical Center because he was displaying signs of agitation, fear, and confusion.  After being at the hospital for approximately two hours, he went to use the bathroom.  After about ten minutes, he returned to his hospital bed and appeared to fall asleep.  The officer supervising him saw a bag fall from the bed onto the floor. When the officer picked it up, McDonald got up, fought with the officer, grabbed the bag, and put it in his mouth.  Ten people had to come to hold him down.  The bag was dislodged, which contained 26.4 grams of heroin.

The next day, the police executed a search warrant for the safe and found a digital scale, packaging materials, and a loaded 9 millimeter handgun.

---

[2]     The PSR described "Pentedrone Hydrochloride [as a drug] most closely related to Metheathinone."

Apart from those items seized, a CI provided information to the government and later testified before a grand jury that between February 2013 and the time of McDonald's arrest, she helped McDonald sell heroin on a regular basis and she had gone with McDonald on trips to Massachusetts where McDonald would buy heroin and bring it back to Maine.

McDonald was indicted on June 13, 2013, on the two counts and on August 2, 2013, filed a motion to suppress the evidence obtained from the vehicle stop. The motion was denied on September 30, 2013. On March 4, 2014, McDonald entered a conditional plea to both counts, in which he reserved the right to appeal the denial of his motion to suppress.

At sentencing, the government asked for a sentence of 75-months imprisonment, and McDonald suggested a sentence of imprisonment between 55 and 60 months. McDonald was granted a two-level reduction (a "Holder reduction") based on the then-proposed change in the United States Sentencing Guidelines to lower drug quantity calculations by two levels. The court discussed an obstruction of justice enhancement, at which point the government introduced McDonald's medical records. In response to McDonald's argument that his behavior was not willful, the government said that the records demonstrated that McDonald was "calm and cooperative" and in control of his behavior. The court applied the enhancement.

The court noted that the probation officer held McDonald accountable for 97.219 kilograms of marijuana equivalent[3] based on the amounts found and the CI testimony, resulting in a base offense level of 24. The government, "[o]ut of an abundance of caution," proposed a quantity of 62.388 kilograms of marijuana equivalent, resulting in a base offense level of 22. This amount included the 26.4 grams of heroin seized from McDonald, and, based on the CI's proffer and grand jury testimony, the additional grams of drugs involved in other transactions described by the CI. McDonald argued he could be held responsible for only the 26.4 grams of heroin seized from him because, he claimed, the remainder of the drug quantity was based on unreliable CI testimony. The court "accept[ed] the [CI's] testimony and statements that the defendant sold heroin in roughly the quantities urged by the government" but noted that if the CI was "off by as much as 25 percent in terms of her recollection, the defendant would still be in the offense level of 20." Accordingly, the court concluded that McDonald "was involved in a drug quantity somewhere between 40 and 60 grams of heroin, or kilograms of marijuana equivalent" and applied a base offense level of 20.

---

[3] Because two drugs were involved, the heroin was calculated as a marijuana equivalent: 1 gram of heroin is equivalent to 1 kilogram of marijuana.

The court added a two-level enhancement for possession of a firearm, the two-level increase for obstruction of justice, and a three-level reduction for acceptance of responsibility, resulting in a total offense level of 21. McDonald's criminal history, which included sixteen prior convictions -- thirteen of which were scored and many of which were associated with drugs -- placed him at a criminal history category of VI. With the two-level "Holder reduction" the guideline range was 63 to 78 months. The court sentenced him to 75-months imprisonment for each count, to be served concurrently, which accounted for the three months McDonald had already spent in state custody. This appeal followed.

II.

McDonald first challenges the denial of the motion to suppress. He argues that because he did not break any law by traveling below the speed limit or slowing down at different points, the information the officers had did not amount to reasonable suspicion. This argument fails.

Police may stop and briefly detain an individual for investigative purposes if they have a reasonable suspicion of criminal activity. United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013). Because reasonable suspicion requires a particularized and objective basis for suspecting an individual of criminal activity, courts "view the circumstances through the lens of a reasonable police officer," looking to the totality of the

- 9 -

circumstances to determine whether reasonable suspicion existed. Id. at 148. When reviewing a district court's decision on a suppression motion, we review its factual findings and credibility determinations for clear error, while we review its legal conclusions de novo. Id. at 147. "Absent an error of law, we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record." United States v. Lee, 317 F.3d 26, 29-30 (1st Cir. 2003).

The district court had a reasonable basis to deny the motion to suppress. Ample evidence supported a suspicion of legal wrongdoing when the police pulled over White's car. Specifically, the officers had knowledge that the burglary complainant associated White with the burglary; that White struggled with drug-dependency, and "drug seekers often resort to property crime to support their habits"; that White was associated with Desmond, who was associated with the suspicious pawning activity and had tried to pawn goods that were similar to those taken in the burglary; that White's car was likely used in connection with the pawning activity; that because the pawn dealer did not accept all of the goods, some of them may have remained in White's car; that White's car was at a trailer that was associated with Desmond; and that the car was driving in an overly cautious manner with a "suspicious application of [its] brakes." Further, Officer Greeley testified that he believed the car was driving in this manner in preparation

to stop so that someone could flee.  Altogether, that suffices. Cf. United States v. Arthur, 764 F.3d 92, 98 (1st Cir. 2014) ("We think it virtually unarguable that a reasonably prudent police officer, standing in [the officer's] shoes and knowing what [he] knew, would have harbored such a suspicion."); see also United States v. Arvizu, 534 U.S. 266, 274 (2002) (explaining that factors that seem to be "innocent" by themselves can together amount to reasonable suspicion).

### III.

Next, McDonald argues that the district court erred in the amount of drugs it attributed to McDonald at sentencing.  His argument appears to have two components: first, that the drug transactions the CI described do not constitute relevant conduct, which he argues for the first time on appeal; and second, that the CI's testimony was unreliable.

Under the Sentencing Guidelines, "a defendant may be held responsible for drug quantities involved in his 'relevant conduct,'" even if the quantities were not involved in the offense of conviction.  United States v. Laboy, 351 F.3d 578, 582 (1st Cir. 2003) (quoting U.S.S.G. § 1B1.3).  If the sentencing court finds by a preponderance of the evidence, see United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999), that a defendant engaged in the "same course of conduct or common scheme or plan" involving additional drugs, it can attribute the amount of those

- 11 -

drugs involved to the defendant.  See United States v. Blanco, 888 F.2d 907, 909 (1st Cir. 1989) (quoting U.S.S.G. § 1B1.3(a)(2)) (emphasis in original omitted).  A "sentencing court's finding that drugs other than those specified in the indictment were part of the same common scheme or course of conduct is entitled to considerable deference," and "[a]bsent mistake of law, we review such conclusions only for clear error."  United States v. Wood, 924 F.2d 399, 403 (1st Cir. 1991).  Because McDonald raises the argument that the transactions described do not constitute relevant conduct for the first time on appeal, we review this part of his argument for plain error.  See United States v. Correa-Osorio, 784 F.3d 11, 17 (1st Cir. 2015) (explaining that the plain error standard requires the appellant to prove "(1) an error, (2) that is clear or obvious, (3) which affects his substantial rights (i.e., the error made him worse off), and which (4) seriously impugns the fairness, integrity, or public reputation of the proceeding," id. at 18).

There was no plain error with the district court's finding that the transactions described by the CI were relevant. McDonald pleaded guilty to possession with intent to distribute heroin, and he expressly said that he "does not dispute his guilt." The district court did not plainly err in finding that multiple drug transactions between February 2013 and McDonald's arrest in April 2013 were part of the same course of conduct or common scheme

- 12 -

or plan, and so qualified as relevant conduct. As the CI explained, over this two-to-three month period that covered the lead up to the offense of conviction, McDonald's activity as a drug dealer took him to Worcester by car to pick up heroin on multiple occasions, returning to Maine to sell it, and then returning to Worcester to restock, all with the assistance of the same person.[4] In Wood, we found no clear error in the district court's conclusion that three transactions were part of the same scheme notwithstanding the defendant's argument that "the sources [of the drugs] varied, his involvement varied and the methods for transporting the cocaine from New York to Maine varied." 924 F.2d at 403–04;[5] see also David v. United States, 134 F.3d 470, 477 (1st

---

[4] The district court did not identify whether it considered the transactions described by the CI as part of the same "course of conduct" or part of a "common scheme or plan." See U.S.S.G. § 1B1.3 cmt. n.9(B) ("Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."); United States v. St. Hill, 768 F.3d 33, 36–37 (1st Cir. 2014) (distinguishing between the two but acknowledging that "the phrases are sometimes used interchangeably," id. at 37). At the very least, it was not plain error for the district court to find the drug transactions were part of the same course of conduct given both the conviction and transactions involved heroin dealing employing a common source, a common re-supply routine, and the same source of transportation. "[I]f the conduct was relevant conduct as part of the 'same course of conduct,' it matters not whether it was also part of a common scheme or plan." Id. at 37.

[5] In Wood, the court found that a fourth transaction involving the defendant's wife about which the defendant was unaware was not part of a common scheme or plan. 924 F.3d at 404.

- 13 -

Cir. 1998) (finding that "[a]lthough the petitioner's drug trafficking resulted in two separate charged conspiracies, the framing of the charges cannot obscure the fact that, throughout the cocaine trafficking described in the indictment, the petitioner and his principal accomplices remained at the center of an ongoing enterprise devoted to a single purpose . . . [because] the petitioner never deviated from his main business: the acquisition, distribution, and sale of cocaine in a specific region").

McDonald's claim that the CI was unreliable because of inconsistencies between her proffer and grand jury testimony and because she wanted to save herself from incarceration time also fails. The PSR and district court identified at least four ways in which the CI's testimony was corroborated by external evidence. First, the CI said that McDonald had a safe and a gun, and the officers indeed found a safe and a gun, which are both tools of drug trafficking. Second, McDonald engaged in recorded jailhouse calls, where he made a statement that he was "coming off . . . five, six grams a day," and tried to get someone to lie if asked about the contents of the safe. Third, McDonald's criminal record included sixteen prior convictions, several of which were drug related. These convictions provided a reason to believe that McDonald was involved in drug trafficking on a regular basis. Fourth, McDonald was unemployed and receiving $678 a month in

disability payments, yet he admitted that his drug addiction cost him approximately $1,000 per week. The district court noted that McDonald "had $1,430 in currency on his person at the time of his arrest with no sign of legitimate gainful employment." The district court did not clearly err in concluding that McDonald's "need to fund [his] own drug habit and the apparent inability of [McDonald] to obtain that kind of money through legitimate means" was consistent with McDonald's dealing drugs, and thereby corroborated the CI's testimony.

Further, the district court accounted for the possibility that "the [CI's] memory is not perfect" by reducing the amount of drugs it attributed to McDonald based on the CI's testimony. And this conservative estimate was even lower than the already conservative estimate in the PSR: when there was a divergence between the proffer and grand jury testimony, the PSR considered the smaller amount. Cf. United States v. Ramírez-Negrón, 751 F.3d 42, 53–54 (1st Cir. 2014) (finding no clear error in the district court's drug quantity calculation when it "was based on the most lenient assumptions toward [the defendant] that the record allowed," id. at 53). We cannot say the district court clearly erred in the drug quantity it attributed to McDonald.

IV.

Finally, McDonald challenges the district court's imposition of an obstruction of justice enhancement. He primarily

- 15 -

argues that because he was "seriously impaired" at the time, he could not have willfully obstructed justice. He also argues that the enhancement should not apply because he did not materially hinder the investigation. These arguments too fail.

The Sentencing Guidelines provide, in relevant part, for a two-level enhancement for obstruction of justice "[i]f . . . the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1(1). A sentencing court's "factbound determination that an obstruction of justice occurred" can be based on "any evidence that it reasonably deems reliable." United States v. Quirion, 714 F.3d 77, 79 (1st Cir. 2013). We review the district court's imposition of an obstruction of justice enhancement for clear error and set aside the district court's determination "only if a review of the record leaves us 'with the definite and firm conviction that a mistake has been committed.'" Id. at 79–80 (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

We find no clear error in the district court's determination that an obstruction of justice occurred. McDonald concealed drugs for two hours at the hospital, and when the drugs fell onto the floor, he attempted to swallow them and became physically combative with the people trying to restrain him. His

argument that he did not willfully obstruct justice fails.  The district court noted that at 10 p.m., two hours prior to the time the heroin fell from McDonald's hospital bed, the nurse's note described him as "calm and cooperative."  As the district court explained, "it was two hours after the arrest.  The defendant knew all along that he had drugs . . . .  The defendant may have acted irrationally when the drugs fell on the floor, but he had plenty of time, namely, two hours, to consider what he was going to do with the drugs that were near his body."[6]  Cf. United States v. Bedford, 446 F.3d 1320, 1326 (10th Cir. 2006) ("The conduct demonstrates his determination to conceal the evidence from the police.  It reflects a deliberate action rather than . . . spontaneous or reflexive conduct . . . ."); United States v. Massey, 443 F.3d 814, 819 (11th Cir. 2006) (finding no clear error in the district court's obstruction of justice enhancement when the defendant "entered the hospital with three objects [containing heroin] inside her body[,] . . . [w]hile at the hospital, she hid two of the objects in her pillow[, and] . . . [w]ith the exception of a few violent outbursts early in her hospital stay, [the defendant] appeared lucid and deliberate").

---

[6]     McDonald's assertion that he was concealing the drugs for later use rather than to obstruct justice does not help his argument.  Even if this were true, by concealing drugs for later use, McDonald ipso facto willfully obstructed justice given his awareness that the drugs he was hiding were pertinent to the government's investigation.

Finally, McDonald's argument that his conduct did not hinder the investigation or prosecution is misplaced. As the district court explained, the provision of the Sentencing Guidelines that refers to a "material hindrance" does not apply in McDonald's case. Application Note 4(D) of U.S.S.G. § 3C1.1 provides that, if the destruction or attempt to conceal evidence "that is material to an official investigation . . . occurred <u>contemporaneously</u> with arrest . . . it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender." U.S.S.G. § 3C1.1 cmt. n.4(D) (emphasis added). Because McDonald's actions at the hospital took place at least two hours after his arrest, this note does not apply, and whether his actions resulted in a material hindrance to the investigation does not affect the analysis. The district court rejected McDonald's argument that his attempt to swallow the heroin was contemporaneous with his arrest. McDonald does not dispute this finding, so any challenge to it is waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

V.

For the reasons set forth above, we <u>affirm</u> McDonald's conviction and sentence.

- Concurring Opinion Follows -

**TORRUELLA**, **Circuit Judge, concurring**.  I join the court's opinion because our precedent establishes that a sentencing court may attribute additional drug amounts to a defendant, to which the criminal defendant has not pled and in addition to the drug amounts specified in the indictment, if the narcotics are part of the same course of conduct or a common scheme or plan as the charged conduct.  See United States v. Blanco, 888 F.2d 907, 909 (1st Cir. 1989).  "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as victims, common accomplices, common purpose, or similar modus operandi."  United States v. Santos Batista, 239 F.3d 16, 21 (1st Cir. 2001) (citing U.S.S.G. § 1B1.3, cmt. n.9).  Despite our precedent, I find this general practice troubling as it routinely results in significant sentence increases based on uncharged, untried, and unpled to behavior.  I fear that our continued acceptance of this practice improperly prejudices criminal defendants and downgrades the quality of our judicial system.